## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION,
100 F Street, N.E.
Washington, DC 20549

Plaintiff,

v.

Case No. 1:21-CV-1869

JURY TRIAL DEMANDED

MIKHAIL KOKORICH,
c/o Dorsey & Whitney
1401 New York Avenue N.W., Suite 900
Washington DC, 20005

Defendant.

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") alleges as follows:

### SUMMARY OF THE ACTION

1.      This case concerns a fraud perpetrated by Defendant Mikhail Kokorich to secure and promote a merger agreement between Momentus Inc. ("Momentus") and Stable Road Acquisition Corp. ("Stable Road"), which, if successful, would effectively take Momentus public and infuse it with nearly $350 million in investor funds.  Momentus is a privately held space technology company that hopes to provide satellite-positioning services.  Kokorich is one of Momentus's founders and was its Chief Executive Officer ("CEO") at all relevant times.  Stable Road is a publicly traded special-purpose acquisition company ("SPAC").

2.      A Russian citizen who since 2018 has faced repeated adverse determinations from U.S. government agencies for national security reasons, Kokorich engaged in fraudulent conduct to secure and promote the merger agreement with Stable Road.  Specifically, Kokorich knowingly

1

or recklessly made misrepresentations of material facts and misleading omissions and deceived both Stable Road and investors regarding: (1) Momentus's key technology which, when tested in space in 2019, failed Momentus's internal criteria for success; and (2) multiple adverse determinations against Kokorich for national security reasons, which materially impaired Momentus's ability to participate in U.S.-based rocket launches so long as he was involved with the company.

3.      Momentus attempted in 2019 to test in space its key technology, a microwave electro-thermal ("MET") water plasma thruster.  However, the MET thruster used during that test was not designed for commercial use, and the thruster failed Momentus's own pre-launch criteria for a successful test.  As a result, Momentus's technology remains unproven.

4.      Moreover, no later than 2018, Kokorich faced multiple adverse determinations by U.S. government agencies because of concerns that he posed a risk to U.S. national security. Therefore, with Kokorich as CEO, Momentus was unlikely to be allowed to participate in U.S.-based rocket launches because U.S. government agencies, including the U.S. Department of Defense, had the authority to block Momentus's involvement in those launches for national security reasons.

5.      In the summer and fall of 2020, Kokorich and Stable Road's CEO negotiated the details of a merger agreement between Momentus and Stable Road.  During those negotiations, Kokorich did not disclose the failures associated with the tests of the MET thruster in space, or that the U.S. government considered him a risk to national security.  To the contrary, Kokorich claimed that the 2019 space test of the MET thruster had been a success and that he was confident that the U.S. government would grant his asylum application, which would allow him to remain and work in the United States.

6.     While he was helping negotiate the terms of the merger, Kokorich also participated in a number of presentations to potential Private Investment in Public Equity ("PIPE") investors, investors who purchase shares of stock in a public company directly from the issuer. Those presentations outlined the purported benefits of the proposed business combination between Momentus and Stable Road and included the material misrepresentations and misleading omissions that Kokorich had previously made.

7.     On October 7, 2020, Momentus and Stable Road announced the signing of a merger agreement that would, if ultimately approved by shareholders, essentially take Momentus public and generate millions of dollars for Kokorich, Momentus and others. They also announced that Stable Road had entered into subscription agreements with PIPE investors, pursuant to which the PIPE investors agreed to purchase an aggregate of 17,500,000 shares of common stock of the merged company for $10.00 per share.

8.     Momentus's business plans and revenue projections, as communicated to PIPE investors and described in registration statements filed with the SEC in connection with the anticipated merger, were premised on Momentus already having proven technology that it could deploy on U.S.-based launches starting in December 2020. But the technology was unproven, and there was profound risk that Momentus would be unable to participate in U.S.-based launches with Kokorich in place as CEO. Because of Kokorich's knowing or reckless conduct and his misrepresentations and misleading omissions of material fact, PIPE and retail investors in the SPAC were given materially misleading information upon which to make their investment decisions.

9.     By engaging in the misconduct described herein, Kokorich violated the antifraud provisions of the Securities and Exchange Act of 1934 ("Exchange Act") and the Securities Act

of 1933 ("Securities Act") and aided and abetted violations by Momentus.  Kokorich will continue to violate the federal securities laws unless restrained or enjoined by this Court.

10.    The SEC seeks injunctive relief, disgorgement, civil penalties, and other appropriate and necessary equitable relief.

## JURISDICTION AND VENUE

11.    The SEC brings this action, and this Court has jurisdiction, pursuant to Securities Act Sections 20(b), 20(d), and 22(a) [15 U.S.C. §§ 77t(b), (d), and 77v(a)], and Exchange Act Sections 21(d)(1) and 27 [15 U.S.C. §§ 78u(d)(1) and 78aa].

12.    Defendant Kokorich, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation and communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange in connection with the acts, transactions, and practices alleged in this Complaint.

13.    Kokorich is subject to personal jurisdiction because, among other things, he lived in the United States during the relevant period, purposefully directed his business activities at the United States, and knowingly provided statements for use in materials used to promote securities transactions in the United States and to be used in SEC filings.  In addition, the merger agreement at issue in this case, which Defendant Kokorich signed in his capacity as the CEO of Momentus, contains a forum selection clause providing that "to the fullest extent permitted by law, the federal district courts of the United States of America shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended," and that "[a]ny person or entity holding, owning or otherwise acquiring any interest in any security of the Corporation shall be deemed to have notice of and to have consented" the forum selection clause.

14.     Venue is proper in this district pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa] because Defendant transacts business in this district and violations of the securities laws alleged in this Complaint occurred within this district, including the filing of false and misleading documents with the SEC.

## DEFENDANT

15.     Mikhail Kokorich, age 45, is a Russian citizen who is currently residing in Switzerland.  He served as Momentus's CEO from the time he helped to start the company in 2017 until his resignation on January 25, 2021.  Kokorich resided in California from at least 2016 until on or about January 27, 2021, when he left the United States.

## OTHER RELEVANT ENTITIES

16.     Momentus is a privately held company incorporated in Delaware and headquartered in Santa Clara, California.  Founded in late 2017, Momentus describes itself as a space infrastructure company, which hopes to provide, among other things, satellite-positioning services.

17.     Stable Road Acquisition Corp. is a Delaware corporation with its principal place of business in Venice, California.  As a SPAC, Stable Road has no operations of its own and exists for the purpose of merging with a privately held company and effectively taking that company public.  On November 13, 2019, SRAC completed its initial public offering of 17,250,000 units at a price of $10.00 per unit, generating gross proceeds of $172.5 million.  Momentus will receive the proceeds of the IPO upon completion of the proposed merger with Stable Road.  SRAC's securities are traded on Nasdaq under the ticker symbols "SRAC," "SRACU," and "SRACW."

## I.     Background

### a.   Momentus Is a Startup with Unproven Technology

18.     Large commercial satellite launch providers offer launch services to satellite owners but only leave these "rideshare" satellites in a limited range of orbits.  Momentus hopes to

offer "last mile" satellite placement services to place these rideshare satellites into custom orbits of the customers' choosing. According to Momentus's plans, Momentus will integrate its customer's payload into Momentus's vehicle, which will then be loaded onto a larger rocket. The rocket will then leave Momentus's vehicle in orbit, at which point Momentus will move its vehicle and the customer's integrated payload into a custom orbit using what it touted in investor presentations as its "cornerstone" technology, a propulsion system using MET water plasma thrusters.

19.     Momentus's business model is premised on the rapid development and testing of its MET water propulsion thruster technology. As Momentus explained in the registration statements at issue in this case: "The success of our in-space infrastructure services business will depend on our ability to successfully and regularly deploy customer satellites into their custom orbits."

20.     In order to do so, Momentus must operate its MET water propulsion thruster reliably in space and provide the necessary thrust and length of operation needed to move customer satellites into specified orbits. An MET water propulsion thruster has never been commercially used in space.

### b. Momentus Needed a Test to Market its Technology and Services

21.     In late 2018 and early 2019, Momentus, as a small startup, lacked in-space flight experience with its thruster to show that it could deploy customer satellites into custom orbits. As Kokorich recognized, it was important for Momentus to demonstrate that it could build, launch and operate an MET thruster system in space. Kokorich expected that a test in space would help to market Momentus and attract investors.

22.     Momentus therefore planned a mission to test its MET thruster in space. In July 2019, Momentus launched an MET thruster on the "MX-1" satellite for the purpose of testing its

thruster in space and performing maneuvers. Prior to the satellite launch, in an internal slide presentation, Momentus partly defined "mission success" as "100 individual burns of 1 minute of more." A "burn" refers to operating the thruster producing thrust for a period of time.

23. Before the launch of its test mission, Momentus conditioned the public to believe that the mission would demonstrate the thruster's commercial viability. For example, in a January 2019 blog post on its website, Momentus stated that the mission, which it named "El Camino Real," would give investors "absolute confidence" that Momentus's service would be "on time, safe and reliable." Momentus went on to say that it would "be able to run the thruster long enough to fully characterize its performance in space with dozens of stop start cycles and [to] then safely de-orbit the vehicle."

24. Momentus, through its launch partner, stated in a publicly filed FCC application on September 12, 2018, that El Camino Real was "a commercial demonstration" of Momentus's propulsion system that would show its "reliability, longevity, performance, and utility." Momentus explained in the FCC application that the mission's objective was to demonstrate that its thrusters provide "cost-effective high delta V [change in velocity from thrust] capability" and thereby show that "this particular system is mature enough to be used by the small satellite market, and can be quickly and easily integrated with CubeSats as well as larger, more capable spacecraft." Kokorich reviewed this application at the time it was submitted to the FCC.

25. Contrary to the claims in Momentus's blog post or in the FCC application, the Momentus MET water propulsion thruster, as integrated into the MX-1 satellite, was not powerful enough or appropriate to provide commercial satellite-placement services. Moreover, the thruster was not powerful enough to provide any measurable or detectible changes in the MX-1 satellite's orbital velocity. As one former Momentus officer stated, the thruster tested in the El Camino Real

7

mission did not have "commercial potential" because it was "too small, too inefficient, too low in [specific impulse], too low in total impulse."

### c. Momentus's Test Failed

26.     The El Camino Real mission was a failure. After experiencing significant problems with supporting sub-systems and its propulsion system, Momentus attempted only 23 firings, and data suggests that only three hot firings produced plasma.  None of those firings lasted a full minute or generated measurable thrust.  Momentus lost contact with the satellite approximately three months into the planned six-month mission and was never able to attempt the remaining 77 firings it had planned, much less achieve any of the "100 individual burns of 1 minute or more."  Thus, Momentus failed to meet its own criteria for mission success, as set forth in its internal slide presentation.

27.     Momentus did not perform "dozens of start and stop cycles" or "safely deorbit" the vehicle, as represented in its January 2019 blog post.

28.     The MX-1 satellite is still in space, but it is not functional.

29.     The El Camino Real mission did not demonstrate the commercial viability of the thruster tested.  One former Momentus officer stated that the mission yielded "no data to suggest that that thruster would deliver an impulse of any commercial significance," and that Momentus was not able to characterize the performance of the thrusters.  Additionally, a Momentus engineer admitted that the mission did not yield sufficient data to demonstrate the propulsion system's reliability or longevity.

30.     Kokorich was kept informed of the relevant aspects of the El Camino Real results. By his own admission, he understood even before the launch that the mission was not designed to show that the thruster could provide measurable delta-v (change in velocity from thrust), to measure specific impulse (the efficiency of the propulsion system), or to show the thruster's

reliability.   Kokorich was also copied on emails in November 2019 between Momentus's Chief Technology Officer and its Chief Engineer discussing creation of a "failure review board" to study the El Camino Real mission, due to the inability to obtain useful data from the mission because of its failure. In addition, one Momentus's engineer internally acknowledged in February 2020, in a document sent to Kokorich, that Momentus did not obtain "any useful mission results" from the launch.

### d.   Kokorich Publicly Mischaracterized the Results from Momentus's Test

31.     In a September 25, 2019, article in the industry periodical Space News titled, "Momentus reports success in testing water plasma propulsion," Kokorich was quoted as stating, "Water plasma propulsion is now technologically mature enough to be baselined for operational in-space transportation missions," meaning it could be used commercially.  He also repeated the claim from Momentus's January 2019 blog post that "the purpose of the El Camino Real mission was to flight demonstrate our core propulsion technology so customers, investors and stakeholders can have absolute confidence that Momentus will deliver their payloads to a given orbit."

32.     As Kokorich knew or was reckless in not knowing, his claims in the Space News article were false and misleading because the El Camino Real mission was never intended to demonstrate the thruster's commercial viability or to give investors and customers "absolute confidence" that Momentus could maneuver customer payloads to a custom orbit.  Moreover, the mission was a failure because the thruster produced plasma, which is necessary but not sufficient to generate thrust, only three times out of 23 attempts, and for less than a full minute each time, which did not meet Momentus's own criteria and explains why they did not obtain "any useful mission results."  Even if the mission had achieved Momentus's internal criteria for success— which it did not, as Kokorich knew—it would not have demonstrated that the thruster was "technologically mature enough to be baselined for operational in-space transportation missions."

### e.  Adverse Determinations Against Kokorich for National Security Reasons

33.     Since 2018, multiple U.S. government agencies have taken actions adverse to Kokorich for national security reasons – a fact known to Kokorich.

34.     The Bureau of Industry and Security ("BIS"), a bureau of the U.S. Department of Commerce, oversees the issuance of export control licenses, which authorize the provision of certain technologies to foreign individuals or entities.  The stated mission of the BIS is to "advance U.S. national security, foreign policy, and economic objectives."

35.     Because Kokorich is a Russian citizen, he could not access Momentus's export-controlled technology without an export control license.  In 2017, Momentus (then operating under the name "Space Apprentices Enterprise") applied for an export control license for Kokorich.  In March 2018, the BIS denied the application. In its rejection notice to Momentus, BIS explained that, after consulting with the Departments of Defense and State, it had concluded that Kokorich was not an "acceptable recipient" of the technology "for national security reasons."

36.     In April 2018, in connection with Kokorich's investment in a different space technology company he founded before Momentus, the Committee on Foreign Investment in the United States ("CFIUS"), an intergovernmental agency that includes the U.S. Departments of Commerce, Defense, and State sent a letter to Kokorich.  In that letter, CFIUS informed Kokorich that it "believe[d]" his investment and the investments of certain others "pose[d] a risk to the national security of the United States."  CFIUS explained that its analysis included an assessment of whether "a foreign person has the capability or intention to exploit or cause harm" (which CFIUS defines as the "threat"), and "whether the nature of the U.S. business creates susceptibility to impairment of U.S. national security (the "vulnerability")."  CFIUS further explained that a national security risk is a "function of the interaction between threat and vulnerability."

37.     On or about June 22, 2018, CFIUS representatives participated in a teleconference with Kokorich's attorneys.  On that call, CFIUS representatives informed Kokorich's attorneys that CFIUS had determined that a full divestiture of Kokorich's participation in the space technology company was necessary to mitigate the national security concerns.

38.     After the teleconference, in a letter response dated June 24, 2018, on which Kokorich was copied, Kokorich's attorneys stated that they understood that CFIUS had deemed Kokorich a national security risk and tried to persuade CFIUS to reconsider this determination. Kokorich's attorneys argued that he was actually a national security asset and a vocal critic of the Russian government.

39.     Kokorich's argument did not work.  In a letter dated June 25, 2018, CFIUS told Kokorich that it would require him to divest his ownership and control interest in the space technology company.  CFIUS explained that its concerns related, in part, to the sophistication of the company's technology and concerns involving Kokorich and other foreign investors.

### f.   Kokorich's Attempts to Legally Remain in the United States Were Repeatedly Rebuffed

40.     In or about June 2018, U.S. Customs and Immigration Services ("USCIS") revoked Kokorich's work visa and denied his application for permanent resident status.  In response, Kokorich applied for political asylum and withholding of removal proceedings in September 2018, claiming again that he was a prominent critic of the Russian government.

41.     A year later, on or about August 28, 2019, USCIS issued a referral notice informing Kokorich that it had not granted his asylum application, and that it had referred his case to an immigration judge for adjudication in removal proceedings.  USCIS stated that its determination was based on "inconsistencies" in Kokorich's application and testimony "with regard to [his] political affiliations and activities in Russia."

42.     On or about that same date, multiple government agencies, including the FBI, the U.S. Department of Homeland Security, and the BIS's Office of Export Enforcement, arrived unannounced at Momentus's headquarters.  Agents questioned multiple Momentus employees about possible export control violations by Kokorich as well as improper technology transfers.

43.     Before they left, the federal agents detained Kokorich and transported him to an immigration detention center.  Kokorich was subsequently released on bond.

### g.  Kokorich Sought a SPAC Merger with Momentus

44.     By late 2019, Momentus was in constant fundraising mode.  The company had no revenues and needed additional capital to fund its growth.  Beginning in early 2020, Kokorich had discussions with an investment bank in an attempt to secure additional capital for Momentus's operations.  In mid-2020, Momentus formally engaged the bank and sought its assistance to find a suitable SPAC candidate for a merger.

45.     In addition to his discussions with Stable Road, Kokorich had discussions with two other SPACs.  The two other SPACs chose not to move forward with a merger with Momentus because Momentus was still at a relatively early stage and immature as a company.

46.     On or about June 29, 2020, Kokorich and Stable Road's CEO met in person for the first time at Stable Road's offices in California to discuss the possibility of a merger between the two companies.  After the initial discussion, merger negotiations began in earnest in July 2020. Kokorich remained heavily involved in merger negotiations, including on the subject of Momentus's valuation and business model.  He also helped develop a list of PIPE investors to contact and reviewed draft presentations to PIPE investors.

47.     Pursuant to the merger agreement ultimately signed by Momentus and Stable Road, if approved by the shareholders, Kokorich would become the CEO of the new merged company.

Kokorich was also entitled to exchange his shares of Momentus stock for approximately 19 million shares of stock in the new publicly traded company, which would be between 13.5% and 14.3% of the total shares outstanding.

## II.    Kokorich and Momentus Made Misrepresentations of Material Fact and Misleading Omissions about Momentus's Technology

48.    From his very first meeting with Stable Road's CEO on June 29, 2020, Kokorich made misrepresentations and misleading omissions of material fact.  For example, Kokorich told Stable Road's CEO that the El Camino Real mission had been a success and that it was a great achievement for Momentus to have fired the thruster and tested its propulsion technology in space. Specifically, Kokorich said that Momentus had performed a number of tests, with recorded data, and that the vehicle was still in space although they could no longer conduct additional tests.

49.    Notably, in that discussion, Kokorich omitted material facts that made his statements about the El Camino Real mission misleading.  Kokorich did not tell Stable Road's CEO of any of the failures, problems, shortcomings, or issues with the El Camino Real mission described above.  Moreover, Kokorich did not explain to Stable Road's CEO that the El Camino Real mission was not designed to show any demonstrable impulse or delta-v from the thruster, or to demonstrate the thruster's reliability.

50.    At the time he made these misstatements and misleading omissions of material fact, Kokorich knew, was reckless in not knowing, or should have known that Stable Road and its CEO would rely on his statements in determining to proceed with the merger and PIPE fund-raising, and that his false and misleading statements would be repeated to investors while promoting the merger.

51.    Before signing the merger agreement, Momentus and Stable Road made multiple presentations to potential PIPE investors via Zoom.  Kokorich personally participated in these

presentations, and he mentioned the alleged "success" of the El Camino Real mission, but failed to disclose the significant failures, problems, shortcomings, and issues described above. The presentations were conducted by video conference and included slides that were shown to the PIPE investors during the presentations. Each of those presentations contained a slide titled, "Momentus at a Glance," which misleadingly claimed that Momentus "successfully tested water based propulsion technology on a demo flight launched mid-2019 – is still operational today." In total, PIPE investors agreed to purchase 17,500,000 shares of common stock of the merged company for $10.00 per share.

52.     Momentus and Stable Road announced their merger on October 7, 2020. That day, Kokorich and Stable Road's CEO made a presentation on a conference call to analysts and institutional investors using slides virtually identical to the ones shown to PIPE investors. This presentation similarly contained the claim that Momentus "successfully tested water based propulsion technology on a demo flight launched mid-2019 – is still operational today." In his scripted comments, Kokorich falsely reiterated that Momentus had "successfully tested our groundbreaking thruster in space." Again, Kokorich failed to disclose the significant failures, problems, shortcomings, or issues described above. Stable Road publicly filed a copy of these slides and the presenters' script on a Form 8-K later that day.

53.     During Kokorich's tenure as Momentus's CEO, Stable Road filed an initial S-4 registration statement related to the merger on November 2, 2020, and a subsequent amended registration statement on December 14, 2020. A registration statement is a filing with the SEC making required disclosures in connection with the registration of a security, a securities offering, or an investment company under federal securities laws.

54.     Kokorich participated in the preparation of the November and December 2020 S-4 registration statements, and specifically the subsections of the S-4 statements that described or contained information about Momentus.   In addition to the overall review and approval of Momentus's portion of the registration statements as Momentus's CEO, Kokorich helped to draft what he described as the technology and business or market strategy sections of the S-4 statements.

55.     Each registration statement contained a subsection titled, "Information about Momentus" that is written in Momentus's voice, and that Momentus drafted.   In this subsection of each registration statement, Momentus falsely states that it "successfully tested our water plasma propulsion technology in space," referring to the El Camino Real mission.

56.     Each subsection also contained a graphic captioned: "Our water plasma propulsion technology."   In the body of the slide there is a diagram of a thruster surrounded by various claims about the thruster's functionality, including: "High ISP – Tunable up to 2 to 5 times common chemical propulsion systems"; and "High thrust – Tunable up to 3 to 10 times most common electrical propulsion systems."

57.     Momentus's characterizations of the El Camino Real mission in the registration statements were false and misleading.   Momentus boasted in its graphic that its "water plasma propulsion technology" offered high thrust and high ISP (specific impulse), and elsewhere claimed that its "water plasma propulsion technology" was successfully tested in space.   However, the El Camino Real mission did not demonstrate high thrust or high specific impulse.   It did not demonstrate that the thruster it tested was "tunable up to 2 to 5 times common chemical propulsion systems" or "up to 3 to 30 times most common electrical propulsion systems."   The registration statements failed to disclose any of the significant failures, problems, shortcomings, or issues

described above.  The claims in the registration statements that Momentus "successfully tested" its technology were therefore materially false and misleading.

58.     Moreover, the only publicly available criteria for what constituted success for the mission were contained in Momentus's pre-launch blog post and the FCC application filed by Momentus's launch partner.  By characterizing the mission as a success without explaining the many failures and problems experienced during the mission, or that the mission failed Momentus's pre-launch evaluation criteria, Kokorich and Momentus made materially false statements and/or omitted facts necessary to make their statements not misleading.

59.     Investors had no way of knowing, based on the bare claim that the El Camino Real mission "successfully tested" Momentus's thrusters, that the mission did not demonstrate that Momentus's services would be "on time, safe and reliable," as promised in the blog.  Similarly, they had no way to know that the mission did not demonstrate the thrusters' "reliability, longevity, performance, and utility," as described in the FCC application.

60.     On June 29, 2021, Stable Road and Momentus filed with the SEC an amended registration statement that corrected these false statements and misleading omissions by describing the actual results of the El Camino Real mission.  The registration statement explained that "[t]he mission's objective was to demonstrate the MET's ability to produce water plasma in space by performing 100 one minute firings."  After discussing the failure of the MX-1 satellite, and the associated problems with the attempted firings of the thruster which were stopped "after only 23 of the planned 100 firings had been performed," the statement clarified that "a pump issue significantly restricted flow of water into the thruster during nine of the 12 hot firings, preventing plasma generation" and that "the three hot firings that did have water present were found to have produced plasma."

61.     Kokorich and Momentus's false statements and misleading omissions were material to investors.  Because Momentus can only generate revenue under its current business plan if its thruster can generate commercially significant thrust, reasonable investors would find it important to know whether Momentus had actually proven that its technology is commercially viable.  They would find it important to know whether Momentus had shown that its services would be "on time, safe and reliable" or whether Momentus could "deliver [customer] payloads to a given orbit."  They would also find it important to know whether the mission succeeded according to Momentus's pre-launch definition of success.  By misleading investors about the results of the in-space testing, Kokorich and Momentus gave investors false comfort that Momentus was further on the road to the commercial deployment of its technology than it actually was.

62.     Kokorich and Momentus knowingly or recklessly made the misrepresentations and omissions of material fact regarding the El Camino Real mission, as described in paragraphs 48 through 61 above.  They understood that the launch was never designed to test the commercial viability of Momentus's thrusters.  They also knew that the launch did not yield "any useful mission results," as one of Momentus's engineers wrote in an internal document shared with Kokorich.  Yet they claimed that the test would give investors "absolute confidence" that Momentus could deliver customer payloads to a given orbit and repeatedly represented that the mission was a success without any qualification.

### III.   Kokorich and Momentus Made Misrepresentations of Material Fact and Misleading Omissions about Kokorich's National Security Issues

#### a.  U.S. Government Agencies' National Security Determinations Regarding Kokorich Threatened Momentus's Viability

63.     Before it is able to launch any vehicle on a U.S. mission, Momentus or its launch partners must obtain licenses from various U.S. government agencies, including the Federal

Aviation Administration ("FAA").  Those agencies have the authority to deny a license for national security reasons and work in consultation with the U.S. Department of Defense to determine if the payload of a mission presents a national security risk.

64.     If Momentus or its launch partner is unable to obtain the necessary licenses, Momentus cannot execute on its business plan.  It may be unable to conduct additional missions to test its technology.  It may also never be able to offer commercial satellite placement services.

65.     The U.S. government's national security-related determinations about Kokorich therefore posed a significant threat to Momentus's ability to participate in launches and generate meaningful revenue and were material.

###### b. Kokorich and Momentus Repeatedly Mischaracterized Kokorich's National Security Issues

66.     Just as he had misled Stable Road's CEO about the purported "success" of the El Camino Real mission, from the beginning of the merger discussions, Kokorich told Stable Road's CEO that he was confident that his asylum application would be approved.  Specifically, Kokorich told Stable Road's CEO prior to signing the merger agreement that he had a strong case for political asylum, and that he also had a second path to U.S. citizenship if for any reason the asylum application was not granted.  Kokorich's immigration status was of interest to Stable Road because Kokorich was supposed to lead the new company and because Momentus described him as important to the company's success.  As Momentus stated in the relevant registration statements filed on November 2, 2020 and December 14, 2020, "Momentus is highly dependent on Mikhail Kokorich, its co-founder and chief executive officer. Mr. Kokorich invented the majority of Momentus's inventions and remains deeply involved in Momentus's business."

67.     Notably, Kokorich did not tell Stable Road's CEO that the USCIS had previously issued a referral notice saying that it had not granted his asylum application, and that it had referred

his case to an immigration judge for adjudication in removal proceedings.  Kokorich also assured Stable Road's CEO that the CFIUS divestiture order regarding his other space technology company was closed, and that it was a different situation from his Momentus ownership.  In that vein, Kokorich asserted that the issues CFIUS raised in the prior matter had to do with other investors, not specifically him, even though he knew or was reckless in not knowing the opposite was true based on CFIUS's communications with his counsel.

68.     Kokorich and Momentus also failed to share with Stable Road the extent of Kokorich's national security issues with the U.S. government.  Specifically, they did not tell Stable Road that U.S. government agencies had previously, and repeatedly, made adverse determinations against Kokorich for national security reasons.

69.     Despite Kokorich's assurances that his asylum application would be granted, U.S. government agencies' adverse determinations against Kokorich for national security reasons continued to create problems for him and Momentus in the months leading up to the merger announcement.  In February 2020, Momentus filed a new application for an export control license for Kokorich.  On April 15, 2020, Momentus learned that the application's status was "hold without action," meaning the application had been placed on hold by the BIS reviewer.  On October 7, 2020, the day the merger was announced, a BIS representative emailed Momentus's Deputy General Counsel and Chief Ethics and Compliance Officer to convey, in part, that the Departments of Defense and State had indicated that they would recommend denying the application.  Two days later, the same representative further disclosed that the Departments of Defense, State and Energy had all recommended denying the application.  On October 23, 2020, the representative emailed to disclose that BIS's Operating Committee had determined to deny the license, although the representative indicated the possibility that he might seek to appeal that decision internally.

70.     On November 9, 2020, after the filing with the SEC of the first registration statement for the merger, but before the filing of the second registration statement, Momentus and Kokorich learned that there would be no internal appeal and that U.S. Department of Commerce would deny Momentus's pending application for an export control license for Kokorich. Momentus received the formal notification of the intent to deny the application.  That letter notification stated that Momentus's technology would make a "significant contribution to the military potential to any other country or combination of countries which would prove detrimental to the national security of the United States" and that Kokorich was not an acceptable recipient of Momentus's technology.

### c.     Kokorich's National Security Issues Negatively Affected Momentus's Operations

71.     The growing issues that Momentus faced by having Kokorich as a CEO came to a head in December 2020, just two months after the merger announcement.  Momentus was scheduled to participate in a launch with a large commercial launch provider in January 2021.  That launch represented a key milestone for Momentus because it was supposed to be the company's first commercial flight.

72.     On December 22, 2020, the FAA notified the launch provider that it would not approve the upcoming rocket launch with Momentus's payload on board.  As a result, the launch provider removed Momentus's payload from its rocket and proceeded with the launch. On January 4, 2021, Momentus issued a press release stating that it was "remanifesting its January 2021 mission to a subsequent launch opportunity in 2021," which would "allow for the additional time necessary to secure FAA approval of Momentus's payloads."  On January 7, 2021, the FAA sent a letter to the launch provider explaining that the Department of Defense had identified potential national security concerns with Momentus's payloads and that it could not approve the provider's launch if

it included Momentus's payload because the Department of Defense's review would not be complete before the launch date.

73.     Shortly after this setback, on January 21, 2021, Momentus learned of a letter from the Department of Defense stating that Momentus posed a risk to national security as a result of Kokorich's ownership and control of the company.  On January 25, 2021, Kokorich stepped down as CEO of Momentus and placed his shares of Momentus stock in a voting trust.

74.     Even that did not solve Momentus's problems, however.  In May 2021, the FAA once again did not approve Momentus's participation in a June 2021 launch with the launch provider. On May 10, 2021, Momentus received a letter from the U.S. Federal Aviation Administration ("FAA") denying Momentus's application for a payload review.

75.     The FAA explicitly based its denial on a finding that the launch of Momentus's payload would jeopardize national security due to Momentus's then-current corporate structure.

76.     Later in May 2021, the launch provider informed Momentus that it would not allow any Momentus payload on any launch through the end of the year while Momentus "works to secure approvals from the U.S. government."  Momentus's best-case scenario, therefore, is an inaugural commercial launch in January 2022, a full year after Momentus hoped to begin offering commercial services.

77.     On June 9, 2021, Kokorich and Momentus entered into a National Security Agreement with CFIUS, pursuant to which Kokorich agreed to fully divest from the company and Momentus agreed, among other things, to implement increased security measures and appoint a CFIUS-approved director to its board of directors.

### d. Material Misrepresentations and Misleading Omissions in the Registration Statements

78.     As a result of Kokorich and Momentus's deception, both the initial registration statement, filed in November 2020, and the amended registration statement, filed in December 2020 (after Momentus learned that Kokorich's most recent application for an export license would be denied for national security reasons), contain material false statements and misleading omissions regarding Kokorich's national security status.  As described in Paragraph 54, Kokorich participated in the preparation of the November and December 2020 S-4 registration statements. In his role as CEO, Kokorich generally reviewed and approved Momentus's portion of the registration statements.

79.     As described above, each registration statement contained a subsection titled, "Information about Momentus," that Momentus drafted.  Kokorich reviewed and approved these subsections before they were provided to Stable Road for inclusion in the registration statement. In that subsection, Momentus stated that it believed Kokorich's asylum application would be granted.  Because the U.S. government would be unlikely to grant asylum to an individual it viewed as a national security threat, that statement falsely implied that Kokorich was not a national security risk.  Kokorich knew that multiple U.S. government agencies had raised national security concerns about him and had provided specific grounds for doing so.  To state that Momentus believed Kokorich's asylum application would be granted without disclosing the actions taken by these agencies or their stated grounds for doing so was materially misleading.

80.     Additionally, in the "Risk Factors" subsection, which Momentus also drafted and provided to Stable Road for inclusion in the registration statement, and which Kokorich reviewed and did not correct, Momentus disclosed that Kokorich had not "yet" obtained an export control license.  Momentus did not explain, however, that the BIS had denied Momentus's first application

in 2018 because of national security issues.  It also did not explain that, at the time of the first registration statement, Momentus's pending application had been placed on hold or that, at the time of the second registration statement, BIS had formally communicated its intent to deny the application for national security reasons.  Those omissions were materially misleading because they left investors with the impression that Momentus anticipated that Kokorich would ultimately receive an export control license, when in fact the company had no basis for that expectation given Kokorich's national security problems.

81.     Both the initial and first amended S-4 registration statements included aggressive revenue projections for Momentus, forecasting that the company would grow from zero revenues in 2019 to revenues of over $4 billion in 2027.  Those projections were materially misleading, however, because they failed to disclose that Kokorich's ownership and leadership of the company jeopardized Momentus's ability to earn any revenue from U.S.-based launches, and Momentus only had U.S.-based launches planned at the time.

82.     Kokorich knew all of the relevant facts related to the various adverse determinations against him for national security reasons.  Specifically, Kokorich knew that in 2018 he had to divest his interest in his prior space technology company because CFIUS determined he posed a threat to national security.  He also knew that Momentus's 2020 application for an export control license for him would be denied for national security reasons.  Similarly, he knew that his asylum application was based on a claim that he was a prominent critic of the Russian government, an argument that had failed to persuade CFIUS in 2018 that he was not a national security risk.  And he knew or was reckless in not knowing how his status as a national security risk could threaten Momentus's ability to join U.S.-based launches as discussed in Momentus's business plans.

83.     Kokorich also knew or was reckless in not knowing that he failed to share this information with Stable Road.  He also knew or was reckless in not knowing that the omission of the fact that the denial of the export control licenses for Kokorich because he had been deemed a national security risk would mislead investors.  And he knew or was reckless in not knowing that his claim that his asylum application would likely be granted, which ignored the U.S. government's repeated conclusions that he was a national security risk, was false.

## CLAIMS

### FIRST CLAIM FOR RELIEF

(Against Kokorich for Violations of Section 10(b) of the Exchange Act and Rule
10b-5 Thereunder)

84.     Paragraphs 1 through 83 are realleged and incorporated by reference as if fully set forth herein.

85.     By reason of the conduct described above, Kokorich, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, directly or indirectly: (a) used or employed devices, schemes, or artifices to defraud; (b) made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons. As alleged above, Kokorich's fraudulent violations included: misleading Stable Road and its representatives regarding Momentus's technology and his own national security issues; participating in the creation, editing, or approval of investor presentations that contained misrepresentations or misleading omissions of material fact; making false and misleading statements and omissions of material fact directly to PIPE investors; and participating in the

creation, review and approval of portions of the relevant registration statements that contain misrepresentations or misleading omissions of material fact.

86.     While engaging in the conduct described above, Kokorich acted knowingly or recklessly.

87.     By engaging in the conduct described above, Kokorich violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

(Against Kokorich for Violations of Section 17(a) of the Securities Act)

88.     Paragraphs 1 through 83 are realleged and incorporated by reference as if fully set forth herein.

89.     By reason of the conduct described above, Kokorich, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.  As alleged above, Kokorich's fraudulent violations included: misleading Stable Road and its representatives regarding Momentus's technology and his own national security issues; participating in the creation, editing, or approval of investor presentations that contained misrepresentations or misleading omissions of material fact; making false and misleading statements and omissions of material fact directly to PIPE investors; and participating

in the creation, review and approval of portions of the relevant registration statements that contain misrepresentations or misleading omissions of material fact.

90.     While engaging in the conduct described above, Kokorich acted knowingly, recklessly, or negligently.

91.     By engaging in the conduct described above, Kokorich violated, and unless restrained and enjoined will again violate, Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

(Against Kokorich for Aiding and Abetting Momentus's Violations of Section 10(b) of the Exchange Act)

92.     Paragraphs 1 through 83 are realleged and incorporated by reference as if fully set forth herein.

93.     Momentus violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by reason of Kokorich's conduct described above and by making false statements and misleading omissions of material fact in the relevant registration statements.

94.     Kokorich knowingly or recklessly provided substantial assistance that aided and abetted Momentus's violations.

95.     Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Kokorich is liable for Momentus's violations.

## FOURTH CLAIM FOR RELIEF

(Against Kokorich for Aiding and Abetting Violations of Section 17(a) of the Securities Act)

96.     Paragraphs 1 through 83 are realleged and incorporated by reference as if fully set forth herein.

97.     Momentus violated Section 17(a) of the Securities Act [15 U.S.C. §§ 77q] by reason of Kokorich's conduct described above and by making false statements and misleading omissions of material fact in the relevant registration statements.

98.     Kokorich knowingly or recklessly provided substantial assistance that aided and abetted Momentus's violations.

99.     Accordingly, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Kokorich is liable for those violations.

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

**I.**

Issue findings of fact and conclusions of law that Defendant Kokorich committed the alleged violations.

**II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Kokorich and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**III.**

Order Defendant to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon, under Section 21(d)(5) and Section 21(d)(7) of the Exchange Act.

## IV.

Order Defendant to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

Enter an order against Kokorich pursuant to Sections 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Sections 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibiting him from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

## **JURY TRIAL DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a jury trial on all the issues so triable.

Dated:  July 13, 2021                    Respectfully submitted,


                                         /s/ Fernando Campoamor-Sánchez
                                         Melissa Armstrong
                                           Tel: 202.551.4724
                                           Email: armstrongme@sec.gov
                                         Fernando Campoamor-Sánchez (DC Bar No. 451210)

Tel: 202.551.8523
Email: campoamorsanchezf@sec.gov

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549