# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | CASE NUMBER 1:21-CV-01869-RC |
| ) | |
| v. ) | JURY TRIAL DEMANDED |
| MIKHAIL KOKORICH, ) | ORAL ARGUMENT REQUESTED |
| Defendant. ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT MIKHAIL KOKORICH'S MOTION TO DISMISS THE COMPLAINT

Thomas O. Gorman #398734
gorman.tom@dorsey.com
Erica F. Andrews #1048523
andrews.erica@dorsey.com
DORSEY & WHITNEY LLP
1401 New York Avenue NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 442-3000
Fax: (202) 442-3199

Attorneys for Defendant MIKHAIL
KOKORICH

DATE: September 27, 2021

## <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION ................................................................................1

II.  STATEMENT OF FACTS .................................................................3

    A.  Background ...............................................................................3

        1.  Astro Digital....................................................................4

        2.  The successful test flight -- the MET fired in space ...............6

        3.  Statements regarding the test flight: Stable Road, PIPE Investors, Others ............8

        4.  Immigration status ...........................................................10

        5.  DoD changes position; Mr. Kokorich resigns.........................11

III. ARGUMENT ...................................................................................12

    A.  The Complaint Fails to Detail Sufficient Facts to State A Cause Of Action and Should Thus be Dismissed ...................................12

    B.  Legal Principles .......................................................................13

        1.  Elements of the claims.....................................................13

        2.  Aiding and abetting..........................................................14

        3.  Pleading Standards ..........................................................15

    C.  The Test Flight: A Failure to Plead Any Claim .........................16

        1.  The test flight statements are true ......................................16

        2.  Plaintiff fails to plead a duty requiring additional disclosure ...............17

    D.  The Immigration claim – Another correct statement...................19

        1.  The Statements – Complete, accurate statements ...................19

        2.  The Proposed Add-Ons – No Duty.....................................20

IV. CONCLUSION.................................................................................22

## **TABLE OF AUTHORITIES**

Page

**Cases**

*Aaron v. SEC,* 446 U.S. 680 (1980)..................................................................... 13, 14

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972)............................... passim

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) .............................................................. 16

*Bacon v. Phelps*, 961 F.3d 533 (2d Cir. 2020)...................................................... 16

*Bell Atlantic v. Twombly,* 550 U.S. 554 (2007) ................................................... 16

*Boguslavsky v. Kaplan*, 159 F.3d 715 (2d Cir. 1998) .......................................... 18

*Carey-Canada, Inc. v. California Union Ins. Co.*, 118 F.R.D. 242 (D.D.C. 1986)..................... 22

*Cent. Bank, N.A. v. First Interstate Bank, N.A.,* 511 U.S. 164 (1994)........................ 14

*Chiarella v. U.S.* 445 U.S. 222 (1980).................................................................. passim

*Dirks v. SEC,* 463 U.S. 646 (1983) .................................................................... 17

*Dura Pharmaceuticals v. Broudo,* 544 U.S. 336 (2005) .................................... 13

*Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976)............................................ 13, 15

*In re Newbridge Networks Securities*, 767 F. Supp. 275 (D.D.C. 1991)................... 13

*In re Progress Energy, Inc.*, 371 F. Supp. 2d 548 (S.D.N.Y. 2005)........................... 20

*In re Proshares Trust Sec. Litig.*, 728 F.3d 96 (2d Cir. 2013)............................... 18

*Janus Capital v. First Derivative Traders,* 564 U.S. 135 (2010) .......................... 13, 14

*Johnson v. Interstate Mgmt. Co.*, 962 F. Supp. 2d 244 (D.D.C. 2013)...................... 3

*JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247 (S.D.N.Y. 2005) ............... 15, 19

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994).............................. 15

*Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454 (2d Cir. 2013) .............................. 14

*Leykin v. AT&T*, 216 F. App'x 14 (2d Cir. 2007) ............................................ 18

*Lorenzo v. SEC* 139 U.S. 1094 (2019) ............................................................................ 13, 14, 17

*Palmer v. Homecomings Financial, LLC*, 667 F. Supp. 2d 233 (D.D.C. 2010) ......................... 15

*Reyes v. Fairfield Props.*, 661 F. Supp. 2d. 249 (E.D.N.Y. 2009) .................................................. 3

*Rouse v. Berry*, 680 F. Supp. 2d 233 (D.D.C. 2010) ................................................................. 16

*Santa Fe v. Green,* 430 U.S. 462 (1977) ...................................................................................... 13

*SEC v. Better Life Club*, 995 F. Supp. 167 (D.D.C. 1998) ......................................................... 14

*SEC v. Brown*, 740 F. Supp. 2d 148 (D.D.C. 2010) ................................................................... 16

*SEC v. E-Smart Techs., Inc.*, 31 F. Supp. 3d 69 (D.D.C. 2014) ................................................. 16

*SEC v. Steadman*, 967 F.2d 636 (D.C. 1992) ............................................................................. 15

*United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923 (D.C. Cir. 2017)............................... 15

*Vacold LLC v. Cerami*, 545 F.3d 114 (2d Cir. 2008) .................................................................. 14

*Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010) ......................................... 16

**Statutes**

50 U.S.C. § 4565 ............................................................................................................................ 5

8 U.S.C. § 1158(b)(1)(B) ............................................................................................................. 20

Exchange Act Section 10(b) ........................................................................................................ 22

Exchange Act Section 20(e)......................................................................................................... 14

Securities Act Section 15(b) ........................................................................................................ 14

Securities Act Section 17(a).......................................................................................................... 22

**Other Authorities**

*In the Matter of Momentus,* Admin. Proc. File No. 3-20393 (Jul. 13, 2021) ................................. 3

Nat'l Imm. Justice Center, Basic Proc. Manual for Asylum Representation Affirm. and In Removal Proceedings, Jurisdiction Over Asylum Applications (2018) at 10, *available at*, https://immigrantjustice.org/sites/default/files/content-type/resource/documents/2018-10/NIJC%20Asylum%20Manual_final%2007%202018.pdf ...................................................... 11

Stable Rd. Acquisition Corp., Current Report (Form 8-K), (Oct. 7, 2020)("Merger Agreement, *available at*, https://www.sec.gov/Archives/edgar/data/1781162/000121390020030403/ea127854-8k_stableroad.htm ........................................................................................................... 4

Stable Rd. Acquisition Corp., Registration Statement (Form S-4), (Nov. 2, 2020) ("S-4"), *available at*, https://www.sec.gov/Archives/edgar/data/1781162/000121390020034368/fs42020_stableroad acq.htm ......................................................................................................... passim

**Rules**

Rule 8(a) ................................................................................................................ passim

Rule 9(b) ................................................................................................... 13, 15, 16, 17

**Regulations**

8 C.F.R § 1003.42(d)(1) ........................................................................................... 20

8 C.F.R. § 208.13 ..................................................................................................... 20

## I.     INTRODUCTION

On January 13, 2021, the Department of Defense ("DoD") for the first time announced a new and dramatically different policy and approach regarding Michael Kokorich:  Now he was under investigation by DoD; now he was a national security concern; now he was a concern to investors.  Gorman Decl., Ex. 4 ("DoD Letter").

The announcement came not in a letter to Mr. Kokorich but in one directed to the then Acting Chair of the U.S. Securities and Exchange Commission ("SEC").  An SEC investigation followed, yielding claims that Mr. Kokorich had made false statements about the initial test flight of Momentus Inc. ("Momentus") and his immigration status regarding his pending application for asylum.  In each case a true statement is alleged to be false by omission because an array of other facts had not been appended to the statements, according to Plaintiff.  Yet, Plaintiff failed to identify any duty to disclose those facts, or any actual reason to add them onto the true statements Mr. Kokorich had made other than the obvious – the new DoD policy.  Mr. Kokorich did the right thing – he submitted the national security questions to The Committee on Foreign Investment in the U.S. ("CFIUS" or "Committee"), the government committee that resolves certain issues regarding national security, and abided by its ruling.

Mr. Kokorich is a Russian national who brought his family to the U.S. from their native country following a successful career there and in the wake of decades of anti-Putin political activity.  A gifted physicist and businessman, he continued his prior work in the private space area by first becoming a shareholder in Astro Digital US, Inc. ("Astro Digital"), a firm active in that area, and later serving as a founder of Momentus.  When questions arose about Astro Digital's handling of sensitive satellite technology, it was Mr. Kokorich who filed a voluntary petition with CFIUS and, in 2018 secured a ruling by which he and other foreign nationals who were shareholders abided.

1

When Momentus was being developed Mr. Kokorich created a new and novel business plan to launch the firm.  It was based on the use of reusable vehicles and a propulsion system that had been known and successfully tested for years, but not in space, known as the MET system. It was based on using water rather than expensive and dangerous chemicals for fuel. And it was Mr. Kokorich who backed a test flight approved by the DoD and other government agencies in June 2019 during which the MET system was successfully ignited in space ("Test Flight"), although there were issues with the functioning of the delivery vehicle furnished by another firm. The Test Flight demonstrated that the new, novel business plan would work for merger partner Stable Road Acquisition Corp. ("Stable Road") – a point he expressed in meetings leading to the merger and subsequent Form S-4 filings made with the SEC.

Likewise, when USCIS referred his application for asylum to the immigration court for *de novo* proceedings where he could litigate the claim, Mr. Kokorich candidly told investors from Stable Road and others who might purchase securities under the S-4 filings the status: He believed it would be granted.  Until the January 13, 2021, DoD letter he had no reason to believe otherwise.

But the January 13, 2021 DoD letter was a game changer.  Now there were questions about how the government viewed him.  To resolve them he used the same approach  to answer the questions regarding Astro Digital:  He filed a voluntary petition with CFIUS.

In the end, Mr. Kokorich resigned from Momentus, voluntarily left the country with his family, and ultimately abided by the ruling from CFIUS, losing most of the value he had built into that company.  He also accepted service in this matter to defend the truth of the statements he made about the Test Flight and his asylum application.  Each statement was true; the SEC has cited no duty to append the array of additional points it claims were omitted.  And, in any event,

those points add nothing to the trustful statements.  This case should in fact be dismissed –

securities fraud is not built on true statements, even if they are muddled with an array of

miscellaneous points.

## II.    STATEMENT OF FACTS

### A.    Background[1]

Momentus was founded by Mikhail Kokorich and Lev Khasis in May 2017.  The

business plan focused on becoming the first space infrastructure firm, keyed to last mile delivery

for satellite placement in space, a largely ignored segment of the launch services business.

Typically, launch services place the satellite in orbit; but do not focus on precise positioning or

last mile delivery.  Momentus planned to use a novel hub and spoke approach with a unique,

inexpensive and reusable vehicle powered by a safe and economical propulsion system to

implement the plan.  Other standard services would fill out the client offerings.  The actual

launch services would be provided by existing partners in the business.

One key to the Momentus business plan was reusable transfer vehicle and fuel depot that

would be parked in space.  The firm's Vigoride vehicle, for example, was designed to be a

---

[1]  The facts in this section are taken either from the Complaint ("Compl.") the documents cited in the Complaint ("Ex.") which are attached to the Declaration of Thomas O. Gorman in Support of Defendant's Motion to Dismiss ("Gorman Decl.") or the SEC administrative proceeding which named Momentus and others as Respondents and which is captioned "*In the Matter of Momentus,* "In the Matter of Momentus, Inc.", Admin. Proc. File No. 3-20393 (Jul. 13, 2021)("Admin. Proc.").  Since that proceeding parallels this action and both were approved by the SEC, the statements in each should be construed as admissions by Plaintiff.  *See Reyes v. Fairfield Props.*, 661 F. Supp. 2d. 249, 265 n.7 (E.D.N.Y. 2009) (The Court is permitted to take judicial notice of filings in related proceedings on a motion to dismiss).  On a motion to dismiss the court can consider material taken from documents cited in the complaint.  *Johnson v. Interstate Mgmt. Co.*, 962 F. Supp. 2d 244, 249 (D.D.C. 2013)("When ruling on a motion to dismiss, the Court may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which a court may take judicial notice.").

reusable part of the hub and spoke system.  The vehicle was built to be parked in space and to

perform proximity maneuvers.  For example, the vehicle could effect in-space delivery and was

equipped with robotic arms to facilitate the delivery of a range of in-orbit services.  *See* Stable

Rd. Acquisition Corp., Registration Statement (Form S-4), (Nov. 2, 2020) ("S-4") at 180, 183,

*available at*,

https://www.sec.gov/Archives/edgar/data/1781162/000121390020034368/fs42020_stableroadac

q.htm; Stable Rd. Acquisition Corp., Current Report (Form 8-K), (Oct. 7, 2020)("Merger

Agreement") at Ex. 99.2 at 14, Ex. 99.3 at 3, *available at*,

https://www.sec.gov/Archives/edgar/data/1781162/000121390020030403/ea127854-

8k_stableroad.htm.

A second key feature was the propulsion system.  It was based on water and used

Microwave Electrothermal or MET technology.  Using water as fuel minimized costs while

maximizing safety.  The technology is the product of three decades of academic research.

Repeated lab tests established its functionality.  It had yet to be tested in space, however.  Mr.

Kokorich, a Russian immigrant, is a talented physicist and businessman who became the driving

force behind Momentus.  *See* S-4 at 46-47.

1.    **Astro Digital**

Astro Digital is a private sector firm in the satellite launch business.[2]  In 2017, the firm

began transporting proprietary satellites.  That technology was the focus of a CFIUS proceeding

voluntarily initiated by Mr. Kokorich.

Mr. Kokorich co-founded Astro Digital with a Canadian citizen, Bronwyn Agrios, in

---

[2] Astro Digital is referred to in the Complaint as "a different space technology company" founded by Mr. Kokorich prior to the founding of Momentus.  Compl., ¶ 36.

2015.  Several other Russian nationals became shareholders.  When the firm became involved with sensitive satellite technology, Mr. Kokorich and his wife filed a voluntary petition with the Committee in 2018 to clarify certain national security issues.  *See* Compl., ¶¶ 36-39. Specifically, a central question was if those shareholders could vote shares of the company, since it was transporting certain technology.  *See* 50 U.S.C. § 4565 ("Section 721")(governing investment by foreign persons).

The issue was resolved by a June 29, 2018 CFIUS ruling which concluded that the Russian national shareholders of the firm must divest their holdings.  *See* Compl., ¶ 39. Specifically, the Committee "determined that there is a threat to [the] national security of the United States that arises as a result of the Transaction."  This meant that that "the nature of the U.S. business creates susceptibility to [the] impairment of U.S. national security . . ."  Compl., ¶ 36.  The "transaction" at issue focused on voting by the foreign national shareholders of Astro Digital.[3]

U.S. Treasury Deputy Assistant Secretary, Investment Security, Aimen Mir, explained the resolution of the proceedings in a letter to counsel for the parties:  "While the nature of CFIUS's national security concerns is classified, the concerns, to the extent that they can be described in an unclassified manner, relate to the sophistication of Astro Digital's satellite technology, including their revisit and download speeds" ("CFIUS Letter").[4]  The foreign

---

[3] CFIUS Order Regarding the Removal of Voting Restrictions Concerning Certain Stock of Astro Digital US, Inc. by Bard Worldwide Limited et al. at 1, 3 and Par. 37 (Jun. 29, 2018) ("CFIUS Order").  CFIUS proceedings are not public.  CFIUS material referenced can be made available to the Court at its request.  *See also* Compl., ¶ 39.

[4] CFIUS proceedings are not public.  CFIUS material referenced can be made available to the Court at its request.

shareholders sold their interests in Astro Digital.[5]

### 2.   The successful test flight – the MET fired in space

At the center of the Momentus business plan was the MET propulsion system, a novel inexpensive, safe, water-based MET propulsion system.  *See* S-4 at 41-44, 178-183.  The basic satellite launch technology had been developed over a period of years.  The Momentus business plan rewrote the basic approach centered on its MET propulsion system.  To move the process from the laboratory and the university and into space, the first of what was planned to be a series of launches were scheduled.  *See* S-4 at 178-181.  The first commercial flight was scheduled for summer 2019. ("Test Flight").  Compl., ¶¶ 22-23; S-4 at 180-181.[6]

Several months prior to the test, the company published a blog post proclaiming its new systems as "ready to fly" ("Blog Post").  Compl., ¶¶ 22-23; Gorman Decl., Ex. 1.  It named the future flight El Camino Real after a legendary Spanish medieval road that took about 200 years to build, beginning in the early 1600s.  The post was actually a congratulatory infomercial salute to the internal company team that worked hard and long to facilitate the novel business plan. The post goes on to state that success will give clients confidence in the new tech at the center of the business plan.  Compl., ¶ 23; Gorman Decl., Ex. 1.

Approval for the Test Flight required sign-off from several government agencies: "Before it is able to launch any vehicle on a U.S. mission, Momentus or its launch partners must obtain

---

[5] Mr. Kokorich's shares, along with those of the other foreign investors, were placed in a trust and sold by a trustee in January 2019.

[6]  Plaintiff attempts to turn the Blog Post into some kind of criteria for success: "The only publicly available criteria for what constituted success for the mission is the pre-launch blog post . . . ".  Compl., ¶ 57.  Indeed, at one point the Complaint refers to the Post as a "promise". Compl., ¶ 58.  The blog post does not state that is is a check list for success on the flight or use the word "promise".  Gorman Decl., Ex. 1.

licenses from various U.S. government agencies, including the Federal Aviation Administrations ("FAA"). Those agencies have the authority to deny a license for national security reasons and work in consultation with the U.S. Department of Defense to determine if the payload of a mission presents . . ." any national security concerns. Compl., ¶ 63.

Astro Digital was selected to provide the launch vehicle (*see* Compl., ¶ 24) and applied for the necessary government approvals. S-4 at 195. The payload was a Momentus Vigoride vehicle, a new, reusable vehicle. The MET system would be the featured new technology. The launch vehicle, and its basic telemetry were standard launch technology.

The FCC application for the flight, prepared by Astro Digital, made general statements about Momentus and the flight but did not detail specific metrics to be achieved for the June 2019 launch. It states in part that the flight will:

> demonstrate that microwave electrothermal thrusters provide cost-effective high delta V capability to SmallSats via orbital maneuvering. . . that this particular system is mature enough to be used by the small satellite market . . . To demonstrate that the thermal control design of this medium power thermal propulsion system has sufficient maturity . . .

S*ee also* Compl., ¶ 24. As Mr. Kokorich and Momentus knew, if the company could not secure launch authority from the government – a variety of agencies including DoD – the firm could not implement its business plan. Compl., ¶ 65. Securing the authority here was thus significant, since those agencies had to approve the launch application. *Id.*

The launch took place as planned. The MET system fired for the first time in space. Compl., ¶ 22. Momentus did not create or disseminate any guidelines or metrics by which to measure the performance of the flight. *See* Compl., ¶ 59.

After the flight Momentus and Mr. Kokorich proclaimed the test a success because the MET system fired in space for the first time. Compl., ¶ 22; S-4 at 191. During the flight, the

new MET propulsion system fired several times.  Those firings, and continued monitoring of the system in space for months after this initial flight, yielded valuable data illustrating the workings of the system, contrary to the statement in the Complaint.  Compl., ¶ 24-25.  The data collected is depicted in a series graphs and charts.  See generally S-4, Merger Agreement at Ex. 99.2.

Following the flight Momentus Chief Technology Officer, Joel Sercel, suggested that a failure review board be established.  The suggestion was for the launch vehicle to ensure that Momentus sorted out those issues with that vehicle: "Even if we recover the spacecraft, . . . it is my judgement [*sic*] that we need to convene a failure review board because the [Astro Digital] computer is proven not reliable enough .. . "  Compl., ¶ 22; Gorman Decl., Ex. 2.  The Complaint also incorrectly reads the email as suggesting that the proposal for a "failure review board" covered the water propulsion MET system (*compare* Compl., ¶ 30 *with* Gorman Decl., Ex. 2).

### 3.    Statements regarding the test flight: Stable Road, PIPE Investors, Others

The Stable Road Acquisition – Momentus' merger agreement was executed on October 7, 2020. Compl., ¶ 22.  At the same time the stock subscriptions for those who purchased a total of 17,500,000 shares at a cost of $10.00 per share with a total cost of $165,000,000 through a PIPE offering, closed.  Compl., ¶ 7.  That event was followed by the filing of three S-4 registration statements prepared by the new firm and filed with the SEC in November and December 2020 and March 2021.  *See* Compl., ¶ 53.

Prior to the closing of the Stable Road merger and the PIPE subscriptions, Momentus, Mr. Kokorich and apparently other firm executives, met with their counterparts at Stable Road and discussed the merger along with the results of the test flight.  Similar meetings were held with the PIPE investors.  During the merger talks, Mr. Kokorich stated, according to the Complaint, that the test mission was "a success and . . . a great achievement . . ." Compl., ¶ 48.

Similarly, in the meetings with the PIPE investors a slide deck, was displayed.  Compl.,
¶ 51.  It was titled "Investor Presentation October 2020" ("Slides") and included a slide titled,
"Momentus at a Glance."  *See* Merger Agreement, Ex. 99.2 at 6.  It stated that the test flight had
been a success and showed a drawing of the MET propulsion system.  Compl., ¶ 51.  *See id.* at 6,
21.

Following the merger the new entity filed two S-4 registration statements with the SEC.
Each filing contained essentially the same material about Momentus.  Each contained essentially
the same statement, noting that the test of the water plasma MET system during its first flight in
space was successfully fired.  S-4 at 120.  Those filings were reviewed by Mr. Kokorich
(Compl., ¶ 51), other Momentus executives, and a cadre of attorneys.  They also cautioned,
among many other things, that the success of the business depended on the development of their
vehicles and related technology, that investments in Momentus may be subject to CFIUS
regulations, and that Mr. Kokorich's asylum petition may not be successful.  *See* S-4 at 40, 46-
47.  *See also* Compl., ¶ 80.  There is no discussion in any of the materials of the difficulties
experienced with the Astro Digital launch vehicle.

The Complaint cites a variety of metrics that might be used to gage performance of a
flight.  Those include statements regarding the propulsion system, (Compl., ¶ 24); its efficiency
(Compl., ¶ 25); and its "commercial viability".  Compl., ¶ 32.  Also cited is the January 2018
Blog Post, and an article published by *Space News*, an industry newsletter, that proclaimed the
Test Flight a success in a headline based on Mr. Kokorich's statement.  Compl., ¶ 31; Gorman
Decl., Exs. 2, 3.  None of these metrics or articles claim that they were specifically designed as a
kind of scorecard for the test flight, contrary to the statements in the Complaint."  Compl., ¶¶ 27,
31, 58.

In the end, Momentus and Mr. Kokorich believed that the Test Flight answered the key question about the business plan:  Did the MET fire?  It did.  In the end no facts are presented nor is any duty alleged in the Complaint, demonstrating that the company or Mr. Kokorich, were required to discuss the additional points alleged in the Complaint.[7]   The statements about the successful test firing of the MET system in space were accurate and correct.

    **4.**    **Immigration status**

Mr. Kokorich told Stable Road's CEO from the beginning of their discussions "that he was confident that his asylum application would be approved."  Compl., ¶ 66.  That application was based on decades of anti-Putin activity by Mr. Kokorich prior to immigrating to the United States as the Complaint notes.  *See* Compl., ¶ 40.  Similar statements appear in each of the S-4 registration statements filed by Stable Road.  S-4 at 47.

The Complaint, however, claims the statements have material omissions because there have been "multiple adverse determinations against Kokorich for national security reasons" since 2018 that made it "unlikely [the U.S. would] grant asylum to an individual it viewed a national security threat".  Compl., ¶¶ 3, 79.[8]  Government determinations involving Mr. Kokorich's immigration status between 2018 and early 2021, when he resigned from Momentus, as presented in the Complaint fail to support this claim:

    1)  In March 2018 The Bureau of Industry and Security ("BIS") essentially reaffirmed its earlier ruling, denying an export license to Mr. Kokorich.  Compl., ¶ 69.  The ruling

---

[7] *See generally* S-4, Merger Agreement, Slides.  *See also* Compl., ¶ 30.

[8] As the Complaint makes clear, concerns over a security risk are a function of access to certain kinds of government proprietary material.  *See, e.g.*, CFIUS Letter.  There is no claim that Mr. Kokorich has ever had any access to proprietary government information.  Accordingly, by definition, he cannot be a national security risk.  *See* Compl. ¶¶ 17-21.  Indeed, as the Complaint alleges, the government conducted an audit of Momentus' headquarters about possible export control violations and technology transfers by Mr. Kokorich.  Compl. ¶ 42.  There is no claim he had any such material.  *See id*.

had no impact on Momentus since it was not dealing with the type of government information covered by an export license.  For similar reasons, the determination by CFIUS as to Astro Digital did not have any direct impact on Momentus.  Compl., ¶ 67.  While the Complaint suggests that each topic should have been included in any discussion of the asylum claim, no facts are presented to support the assertion.  *See* Compl., ¶ 79.[9]

2) In June 2018, The U.S. Customs and Immigration Services ("USCIS") referred Mr. Kokorich's request for asylum to the immigration court, where the conflicts claimed to be present in the factual record of the application could be resolved.  The referral would have no impact on the litigation that would take place in the immigration court as a matter of law.[10]

No facts or legal principles are presented that required the addition of these points to Mr.

Kokorich's opinion about the prospects for his asylum claim in litigation.

### 5.    DoD changes position; Mr. Kokorich resigns

The DoD announced for the first time that Mr. Kokorich was under investigation and

might be a national security risk in a letter dated January 13, 2021 to the Acting Chair of the U.S.

---

[9]  The discussion in the Complaint of the BIS re-affirmance of its pre-2018 decision not to issue an export license to Mr. Kokorich includes a series of communications beginning in early April 2020 noting that the application was on "hold" through November 2020 when it was disclosed that one of the participants decided not to appeal the ruling.  Compl. ¶ 69.  In fact, prior to the end of December 2020, when DoD apparently caused the FAA to cancel a scheduled flight in advance (Compl. ¶ 72) of its letter to the SEC in mid-January 2021, discussed above, the only government determinations on Mr. Kokorich's status are the two discussed above.

[10]  The asylum process through USCIS is wholly separate from asylum proceedings before an Executive Office of Immigration Review Judge in U.S. Immigration Court.  *See* Nat'l Imm. Justice Center, Basic Proc. Manual for Asylum Representation Affirm. and In Removal Proceedings, Jurisdiction Over Asylum Applications (2018) at 10, *available at*, https://immigrantjustice.org/sites/default/files/content-type/resource/documents/2018-10/NIJC%20Asylum%20Manual_final%2007%202018.pdf ("An asylum-seeker who is not in removal proceedings applies for asylum affirmatively with the USCIS asylum office regardless of whether she entered the United States with permission or remains in lawful status.  If USCIS declines to approve the asylum application and the applicant is not in some form of lawful immigration status, the application is referred to the immigration court and removal proceedings commence. At this point, jurisdiction over the asylum application shifts to the immigration court.")

Securities and Exchange Commission ("DoD" letter).  *See* Compl. ¶ 73.[11]  The letter went on to suggest that the SEC launch an investigation.  There is no explanation for the change in position from June 2019 when DoD and other agencies approved the Test Flight.  Shortly after the letter was sent the SEC launched an investigation.

Days later after learning of the DoD letter, Mr. Kokorich resigned all positions at Momentus.  Compl. ¶ 73.  Subsequently, he agreed to an arrangement under which his stock would be liquidated.  He also filed a petition with the Committee to resolve any national security issues.  The Committee later directed that he execute a security agreement.  He did.  Mr. Kokorich and his family have left the United States.  Momentus continues under new leadership.

## III.    ARGUMENT

### A.    The Complaint Fails to Detail Sufficient Facts to State A Cause Of Action and Should Thus be Dismissed

Plaintiff's claim that truthful, complete statements by Mr. Kokorich about the first space firing of the MET system and his belief regarding his asylum claim are somehow false by omission because an array of  miscellaneous points were not added to the statements should be rejected.  It is axiomatic that there is no duty to disclose omitted points absent a clear legal disclosure obligation.  *See, e.g.*, *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 154 (1972)(holding a duty to disclose omitted material must exist to require disclosure). The Complaint here fails to identify any such duty because there is none. That failure requires dismissal of this case.

---

[11] Just prior to the issuance of the DoD letter, the FAA canceled the end of 2020 flight Momentus had scheduled.  No reason was given.  DoD apparently implemented the action. Compl. ¶ 72.

B.    **Legal Principles**

1.    **Elements of the claims**

The Complaint asserts four claims, two based on Exchange Act Section 10(b) and

Securities Act Section 17(a) and two on aiding and abetting.  Each antifraud Section prohibits

fraudulent and manipulative conduct, as well as making false statements.  The Sections are

similar, although not identical.  *See e.g.*, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 203

(1976)(Section 10(b) is a fraud section often described as a catchall, but what it catches must be

fraud);  *see also Aaron v. SEC,* 446 U.S. 680 (1980) (same in context of SEC enforcement

action); *cf. Santa Fe v. Green,* 430 U.S. 462 (1977)(generally discussing the reach of the

antifraud provisions largely in view of manipulative and deceptive conduct).

The elements of a cause of action under each statute are well established: 1) a material

misrepresentation or omission; 2) scienter – wrongful state of mind as to Section 10(b) and 17(a)

or negligence as to Section 17(a)(2) and 17(a)(3); and 3) in connection with the purchase or sale

of a security.  *See, e.g.*, *Dura Pharmaceuticals v. Broudo,* 544 U.S. 336, 341-342 (2005); *see*

*also Aaron* at 687-688, 695-696; *Hochfelder* at 196-197; *In re Newbridge Networks Securities*,

767 F. Supp. 275, 282 (D.D.C. 1991).

To plead a primary violation under either section, Plaintiff must detail facts in accord

with Rule 8(a) and 9(b) of the Federal Rules establishing that, for a false statement the defendant

is either the maker of the statement or that the statement violates the specific language of the

statute.  *See e.g.*, *Janus Capital v. First Derivative Traders,* 564 U.S. 135, 144 (2010)(must be

"maker"); *Lorenzo v. SEC* 139 U.S. 1094, 197-198 (2019) (conduct must violate the text of the

statute for primary liability).

If, as here, the case is based on omissions, the Complaint must allege that there was a

specific duty to include the omitted material.  *See Chiarella v. U.S.* 445 U.S. 222, 228

(1980)("[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so."); *Affiliated Ute* Citizens, 406 U.S. at 152-153 (One must possess an affirmative duty to disclose omitted facts). Absent a specific duty to disclose the omitted facts there can be no liability for false statements based on a claimed omission. *Chiarella*, 445 U.S. at 235 ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."); *See also, Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013) ("In addition, for an omission to be considered actionable under § 10(b), the defendant must be subject to an underlying duty to disclose."); *Vacold LLC v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2008) (An omission is only actionable when there is a duty to disclose the omitted facts).

### 2.       Aiding and abetting

Claims based on aiding and abetting, such as the third and fourth Causes of Action in the Complaint, are governed by Exchange Act Section 20(e) and Securities Act Section 15(b). Each Section was added to the respective statute after the Supreme Court held that there is no cause of action for secondary liability under Exchange Act Section 10(b) in *Central Bank of Denver v. First Interstate. Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 191-192 (1994).

To establish a claim under either statutory provision Plaintiff must properly plead the following elements: 1) a primary violation; 2) substantial assistance; and 3) scienter. *See Aaron*, 446 U.S. at 683-684 (discussing the question of aiding and abetting); *SEC v. Better Life Club*, 995 F. Supp. 167 (D.D.C. 1998).

The question of what constitutes a primary violation in the context of claimed false statements is governed by the Supreme Court's rulings in *Janus* and *Lorenzo*. Scienter under each statute is defined as: "intent to deceive, manipulate, or defraud." *Hochfelder*, 425 U.S. at 193. This circuit had held that "extreme recklessness" constitutes scienter within the meaning of

the statute. *SEC v. Steadman*, 967 F.2d 636, 641 (D.C. 1992). And, substantial assistance

requires that the defendant provide affirmative assistance, help to conceal, or by failing to act

when required to do so, enabled the fraud to proceed. *JP Morgan Chase Bank v. Winnick*, 406 F.

Supp. 2d 247, 256 (S.D.N.Y. 2005).

### 3.        Pleading Standards

Properly pleading a claim under the antifraud provisions of the Exchange Act and

Securities Act fraud section requires meeting a threefold burden: 1) Specific factual allegations

must be presented as to each element of a claim under each statute; 2) those factual allegations

must meet the plausibility standards of Fed. R. Civ. P. 8(a); and 3) the facts pleaded as to each

element except scienter, must meet the particularity standards of Fed. R. Civ. P. 9(b).

The threshold consideration for pleading a cause of action is whether the complaint

presents specific facts supporting each element of each claim. *Palmer v. Homecomings*

*Financial, LLC*, 667 F. Supp. 2d 233, 12 (D.D.C. 2010) ("[P]laintiff must allege facts that, if

true, would establish the elements of each claim."). In assessing this question, unsupported

allegations, supposition and similar matters must be excluded. "[T]he court need not accept

inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the

complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *see also,*

*Nattah v. Bush*, 541 F. Supp. 2d 223, 233 (D.D.C. 2008) (Inferences and conclusory allegations

that are unsupported by facts in the complaint do not need to be considered).

Ultimately the question is if the facts alleged as to each element of a claim, when viewed

in their totality, present a plausible claim on which relief can be granted. *United States ex rel.*

*Shea v. Cellco P'ship*, 863 F.3d 923, 936 (D.C. Cir. 2017); *Bacon v. Phelps*, 961 F.3d 533, 540

(2d Cir. 2020); *Rouse v. Berry*, 680 F. Supp. 2d 233, 5 (D.D.C. 2010). Viewed in this context,

*plausible* means more than possible, it requires that when taken as a whole the facts presented

demonstrate that plaintiff is entitled to the relief sought. *See Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009); *Bell Atlantic v. Twombly,* 550 U.S. 554, 556 (2007); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 42 (D.D.C. 2010).

While compliance with Rule 8(a) is essential, it is not sufficient to plead claims for fraud such as those presented in the Complaint here. The pleader in a fraud action must also meet the heightened standards of Rule 9(b) which applies to fraud claims. Under that Rule, the complaint must present particularized facts as to each element of the fraud claim alleged, except scienter. *SEC v. E-Smart Techs., Inc.*, 31 F. Supp. 3d 69, 82 (D.D.C. 2014).

This means that the who, what, when and where of each fraud allegations must be presented in detail to give the defendant fair notice of what specific wrongful and fraudulent conduct is the predicate for the claim. *SEC v. Brown*, 740 F. Supp. 2d 148, 155 (D.D.C. 2010). Absent specific allegations of fraud which meet the particularity standards of Rule 9(b) as to the element of each claim of the wrongful conduct, and Rule 8(a) as to the state of mind, the complaint must be dismissed.

### C.      The Test Flight: A Failure to Plead Any Claim

Plaintiff has failed to plead any cognizable claim under either Section 10(b) or 17(a) since the statements of Mr. Kokorich regarding the propulsion system operation during the Test Flight are correct – no duty is specified that would have required the array of items cited by the Complaint to be added to his statements. Accordingly, each claim must be dismissed.

#### 1.      The test flight statements are true

Mr. Kokorich's statements regarding the successful firing of the new MET propulsion system are, in and of themselves, correct – it fired in space for the first time. Since the Complaint fails to detail any obligation for the other items scattered through the Complaint, each fraud section should be dismissed.

To plead a claim of primary liability under each section the Complaint must detail specific facts in accord with Rule 8(a) and 9(b) establishing either that Mr. Kokorich was the maker of the statement or that the specific conduct violated the text of each statute.  The only actual statements the Complaint attributed to Mr. Kokorich are those from the Stable Road discussions, the reference in the Slides used at the PIPE investor meetings, the *Space News* article and the S-4 filings.  Each statement is simple and complete – the MET fired, a fact that Mr. Kokorich relied on to express an opinion of success.  Since that fact is without a doubt true there is no fraud claim.  Stated differently Mr. Kokorich is not the maker of a *Janus* false statement or one that contravenes the express language of either Section 10(b) or 17(a) as required by *Lorenzo.*  Accordingly, there is no claim under either statute.

### 2.    Plaintiff fails to plead a duty requiring additional disclosure

Plaintiff's claims that additional facts should be added to Mr. Kokorich's statements, while disregarding the obvious point that statements are true, complete and accurate, is baseless. Each is based on speculation that some investors may want additional disclosure about the test flight.  Yet it is axiomatic that omitted facts are not required to be disclosed absent a specific duty of disclosure.  *Chiarella*, 445 U.S. at 228; *Affiliated Ute Citizens*, 406 U.S. at 153 (in an omission case, must be a specific duty to disclose).  *See also Dirks v. SEC,* 463 U.S. 646, 655 (1983)(reaffirming principle).

Here Plaintiff has not plead any specific facts or principles that constitute an obligation to disclose, to engraft additional facts onto the simple, true statements attributed to Mr. Kokorich about the MET propulsion system.  To be sure, Plaintiff has compiled a series of points that might be discussed, such as the January 2019 Blog Post, which is little more than an infomercial, claims about other systems involved in the flight, and speculation that investors might like to know about various matters – essentially an effort to try and create a kind of "internal controls"

or material claim that might compel additional disclosure.  Each fails.  Plaintiff cannot create internal controls for a firm that has none.  Plaintiff cannot create "promises" as the Complaint claims where none exist.  Indeed, even the claim of materiality advanced by Plaintiff cannot be used to create a duty to disclose.  *In re Proshares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013).  As *Affiliated Ute* and *Chiarella* make clear, no duty equals no obligation to disclose.  Neither Momentus nor Mr. Kokorich had any duty to add any of the claimed points scattered through the Complaint to the statements attributed to them about the test.

Finally, even if the two fraud claims about the test flight statements are viewed through the lens of aiding and abetting, they fail.  To establish a claim under Section 15(b) or 20(e) there must be a primary violator.  The Complaint fails to even suggest that anyone but Momentus or Mr. Kokorich is the primary violator.  Since there are no false statements here, there can be no primary violator and thus no aiding-and-abetting.  *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)(plaintiff must allege a primary violation by a primary violator in order to bring a claim under Section 20(a)); *Leykin v. AT&T*, 216 F. App'x 14, 17 (2d Cir. 2007)("Because plaintiffs have failed to allege primary violations of § 10b or § 14(a), their claims of control person liability under § 20(a) must also fail.").

Equally clear is the fact that even if Plaintiff could create a primary violator there is no "substantial assistance" of any violation by Mr. Kokorich, as required by the statute.  This element is defined in terms of knowing that the primary violator is engaging in wrongful, fraudulent conduct and then providing substantial assistance: "A defendant provides substantial assistance only if [they] affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed."  *Winnick*, 406 F. Supp. 2d at 256 (citations omitted).

In the end, there are no facts pleaded in the Complaint establishing aiding and abetting or a primary violation of either Section 10(b) or 17(a) based on the statements attributed to Mr. Kokorich.  In the end, stating the truth is not fraud.  The claims should be dismissed.[12]

### D.    The Immigration claim – Another correct statement

Plaintiff's claims that Mr. Kokorich violated Sections 17(a) and 10(b) by expressing optimism about his prospects for obtaining asylum should also be dismissed as baseless. Specifically, the claim hinges on the unsupported supposition that when expressing his opinion, Mr. Kokorich was required to also state that 1) USCIS had not ruled on the merits of the claim but rather had referred it to the immigration court for determination and 2) included a discussion of the Committee ruling on Astro Digital and the denial of his request for an export license.  No duty to disclose these points is plead in the Complaint.

### 1.    The Statements –Complete, accurate statements

Plaintiff's claims hinge on three statements.  First, during the pre-merger discussions with Stable Road, Mr. Kokorich expressed optimism that his application regarding his application for asylum then pending before the immigration court would be successful.  Mr. Kokorich had a long history of anti-Putin statements and activities prior to his immigration to the U.S. from Russia.  There is little doubt that those activities could form the basis for a successful asylum claim.  8 U.S.C. § 1158(b)(1)(B); 8 C.F.R. § 208.13.  While there is no actual record of these statements, they are similar to those presented in the S-4 registration statements filed by the

---

[12]  The fact that Sections 17(a)(2) and (3) are based on a negligence standard does not save the claims here as to the test flight statements.  Since there was no duty to disclose the points specified by Plaintiff, there is no claim regardless of the state of mind.  *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) ("For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information.").

company in late 2020.

Second, the two registration statements filed by the company in November and December 2020 echo the comments about the application for asylum claimed to have been made by Mr. Kokorich during the pre-merger discussions with Stable Road. The S-4 filings each contained a cautionary statement regarding the risk surrounding the application. While the Complaint does not specify if this statement was mentioned during the Stable Road merger discussions, there was in fact no need – the risks surrounding any application for political asylum are well known. *In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 552-53 (S.D.N.Y. 2005)(the securities laws do not require the disclosure of information that is publically known). It is thus clear that everyone was aware of Mr. Kokorich's views on the asylum question and the risks.

### 2.      The Proposed Add-Ons – No Duty

Despite the fact that Mr. Kokorich's statements regarding his asylum claim are correct and complete on their face, Plaintiff claims they are false and fraudulent by omission. For example, Plaintiff alleges that Mr. Kokorich should have stated each time he expressed optimism about his asylum claim that USCIS had referred his claim for litigation to the immigration court. Not only does the Complaint fail to cite any *Chiarella* or *Affiliated Ute* duty to support the claim that the administrative history with USCIS should be added on, the claim makes no sense. As a matter of law the proceedings on the case before the immigration court are *de novo* -- they begin on a clean slate. 8 C.F.R § 1003.42(d)(1)("The immigration judge shall make a *de novo* determination as to whether there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim, whether the alien is subject to any mandatory bars to applying for asylum or being eligible for asylum…"). Accordingly, even if something did happen before USCIS – and there is no claim that it did – it would have no impact on the litigation pending before the immigration court.

Equally clear is that that that there is no basis for claiming that Mr. Kokorich had any obligation to disclose the proceedings regarding Astro Digital before the Committee or the determination of the BIS on his request for an export license – again the *Chiarella or Affiliated Ute* duty is absent.  The Astro Digital matter centered on a claim that a firm, whose shareholders were largely foreign nationals, had satellite information that the Committee apparently considered to be proprietard, according to the CFIUS Letter.  That is not the case here.  There has never been any claim that Momentus had access to such information.

Likewise the BIS rulings on the question of an export license has had no impact on Mr. Kokorich or Momentus.  From the founding of the firm through the date Mr. Kokorich resigned from the company he did not have an export license.  Nor did he have any material that would have been covered by an export license as the government audit of his files demonstrated.  Yet the firm was able to establish itself in the market place, conduct a test flight with the government's permission, and attach investors until DoD changed its position, which precipitated Mr. Kokorich's resignation.  Stated differently, Momentus was successful, as was Mr. Kokorich with developing the firm and moving it forward until DoD decided otherwise.[13]

In the end, the simple fact is that the opinions expressed by Mr. Kokorich on the asylum issue, like those he made about the Test Flight were correct.  More importantly, when he learned DoD changed its view of him, he did the right thing – he resigned from Momentus, initiated proceedings before the Committee by which he abided, and left the United States – he did the right thing.  That does not constitute fraud under the federal securities laws.[14]

---

[13] For the same reasons discussed earlier as to the Test Flight, any claims regarding secondary liability under the two aiding and abetting statutes or even based on Sections 17(a)(2) and (3) based on negligence should also be dismissed.  *See* Section II *supra*.

[14] The Complaint alleges that the valuation of Momentus was built on Mr. Kokorich's

**IV.    CONCLUSION**

Mr. Kokorich made the correct, lawful choice at each turn in the road as to Momentus. When there was a question about the foreign national shareholders of Astro Digital voting, he and his wife voluntarily went to CFIUS and asked for a ruling.  When BIS denied him an export license he was walled off from any such material – a fact verified by the failure of the audit instituted on his files to uncover anything inappropriate.  When DoD published a letter making accusations about him in January 2021, in which DoD dramatically and inexplicably changed its position as to Mr. Kokorich, he did the right thing – voluntarily presented a petition to CFIUS asking for clarification and then abided by its ruling.  These are not the kind of actions that are the focus of Securities Act Section 17(a) and Exchange Act Section 10(b).  They are the actions of a man who respects the law, even if the results are not what he hoped for.

WHEREFORE, for the foregoing reasons, Mr. Kokorich respectfully requests that this action be dismissed with prejudice.

---

reputation.  While the November and December 2020 S-4 filings tout his reputation in the private space area, the allegations regarding the preparation of the financial statements are not pleaded with sufficient specificity to permit evaluation of a fraud claim or even a Rule 8(a) plausibility question. Mr. Kokorich requests that those claims be dismissed for failing to plead a claim with sufficient specificity to either present a Rule 8(a) plausible claim or a Rule 9(b) fraud claim. Similarly, Paragraph 60 of the Complaint should be dismissed.  The paragraph summarizes sections of an S-4 registration statement filed by Stable Road with the SEC on June 29, 2021. The contents of the filing with respect to Momentus are largely the same as the filings made earlier with two exceptions: 1) Mr. Kokorich is not listed as CEO since he had resigned at the time of the filing; and 2) the description of the June 2019 test flight and its results have been edited to largely reflect the claims in the Complaint here.  The submission was filed shortly before Momentus, Stable Road and others settled charges with the Commission.  *See Carey-Canada, Inc. v. California Union Ins. Co.*, 118 F.R.D. 242, 245 (D.D.C. 1986)(remedial efforts are not admissible when considering liability for claim).

Dated:  September 27, 2021

Respectfully submitted,

/s/ Thomas O. Gorman
Thomas O. Gorman #398734
gorman.tom@dorsey.com
Erica F. Andrews #1048523
andrews.erica@dorsey.com
DORSEY & WHITNEY LLP
1401 New York Avenue NW, Suite 900
Washington, D.C.  20005
Telephone:  (202) 442-3000
Fax:  (202) 442-3199

Attorneys for Defendant MIKHAIL
KOKORICH

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of September, 2021, a copy of the foregoing

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT

MIKHAIL KOKORICH'S MOTION TO DISMISS THE COMPLAINT was filed electronically

with the Clerk of Court for the United States District Court for the District of Columbia using the

CM/ECF system and accomplished service via the same.

/s/ Thomas O. Gorman
Thomas O. Gorman