**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 1:21-CV-1869-FYP |
| MIKHAIL KOKORICH, | |
| Defendant. | |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**MEMORANDUM OF POINTS AND AUTHORITIES IN**
**OPPOSITION TO DEFENDANT MIKHAIL KOKORICH'S**
**MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

THE COMPLAINT'S FACTUAL ALLEGATIONS....................................................2

    I.    Kokorich Negotiated a Merger Between Momentus and Stable Road from Which He Stood to Earn Millions ...........................................................................2

    II.   Kokorich Made Fraudulent Misrepresentations and Engaged in Other Deceptive Conduct Related to Momentus's 2019 In-Space Testing ........................................3

        a.    Momentus Defined Mission Success Modestly But Inflated External Expectations....................................................................................................3

        b.    The Mission Failed to Meet Momentus's Pre-Launch Standard for Success or Heightened External Expectations.......................................................5

        c.    Kokorich Boasted of Mission Success in 2019, Misrepresenting that the Mission Had Met the Heightened External Expectations .......................6

        d.    Kokorich Misled Stable Road, PIPE investors, and Retail Investors Regarding the Test Mission .....................................................................6

    III.   Kokorich's Fraudulent Misrepresentations and Other Deceptive Conduct Related to Adverse Determinations Against Him for National Security Reasons.............10

        a.    Since 2018, Multiple Government Agencies Have Made Adverse Determinations Against Kokorich for National Security Reasons .......................10

        b.    Adverse National Security Determinations Against Kokorich Threatened Momentus's Viability ...........................................................................13

        c.    Kokorich Misled Stable Road, PIPE investors, and Retail Investors Regarding His National Security Problems .........................................................14

        d.    Subsequent Events Bore Out the Risk that Kokorich's National Security Problems Posed to Momentus..................................................................16

LEGAL STANDARDS .................................................................................................17

ARGUMENT .................................................................................................................18

    I.    The Commission Has Alleged Primary Violations of the Antifraud Statutes .......18

        a.    The Elements of Securities Fraud ..............................................................18

1.    Opinion Statements, Misleading Omissions, and *Omnicare* .........19

2.    Deceptive Conduct and *Lorenzo* .....................................22

b.    The Commission Has Alleged Primary Violations by Kokorich Related to
the 2019 In-Space Testing of Momentus's Thruster.............................................24

1.    The Commission Has Sufficiently Pleaded that Kokorich Made
Misrepresentations ................................................................................24

2.    The Commission Has Sufficiently Pleaded that Kokorich
Employed a Fraudulent Scheme and Engaged in Deceptive Acts,
Practices and Courses of Business..........................................................25

3.    Kokorich's Arguments Related to the 2019 In-Space Testing of
Momentus's Thruster Lack Merit ...........................................................26

c.    The Commission Has Alleged Primary Violations by Kokorich Related to
the Adverse Determinations Against Him on National Security Grounds ............28

1.    The Commission Has Sufficiently Pleaded that Kokorich Made
Misrepresentations ................................................................................28

2.    The Commission Has Sufficiently Pleaded that Kokorich
Employed a Fraudulent Scheme and Engaged in Deceptive Acts,
Practices or Courses of Business ............................................................30

3.    Kokorich's Arguments Related to the Adverse Determinations
Against Kokorich on National Security Grounds Lack Merit ...............31

d.    The Commission Has Stated a Claim Against Kokorich for Aiding and
Abetting Momentus's Primary Violations ...........................................................34

CONCLUSION..................................................................................................35

## **TABLE OF AUTHORITIES**

**CASES**

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972)...................................................................................................27

*Baker v. SeaWorld Ent., Inc.*,
    423 F. Supp. 3d 878 (S.D. Cal. 2019)......................................................................10

*Carey-Canada, Inc. v. California Union Ins. Co.*,
    118 F.R.D. 242 (D.D.C. 1986)..................................................................................10

*Graham v. SEC,*
    222 F.3d 994 (D.C. Cir. 2000).................................................................................33

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) ......................................................................................22

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)..............................................................................19, 20, 29, 30

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011).................................................................................................34

*Lorenzo v. SEC,*
    139 S. Ct. 1094 (2019).......................................................................................22, 23

*Lorenzo v. SEC,*
    872 F.3d 578, 591 (D.C. Cir. 2017), *aff'd*, 139 S. Ct. 1094 (2019).........................22

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)..................................................................... 19-22, 24, 28, 31, 32

*Puddu v. 6D Glob. Techs., Inc.*,
    No. 15-CV-8061 (AJN), 2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021).........................23

*Universal Health Servs., Inc. v. United States*,
    136 S. Ct. 1989 (2016)............................................................................................29

*U.S. ex rel. Totten v. Bombardier Corp.*,
    286 F.3d 542 (D.C. Cir. 2002).................................................................................18

*SEC v. Brown*,
    740 F. Supp. 2d 148 (D.D.C. 2010).........................................................................34

*SEC v. Complete Bus. Sols. Grp.*,
  No. 20-81205, 2021 WL 1907020 (S.D. Fla. May 11, 2021)............................22

*SEC v. e-Smart Techs., Inc.*,
  31 F. Supp. 3d 69 (D.D.C. 2014) (Boasberg, J.).................................................19

*SEC v. Espuelas*,
  908 F. Supp. 2d 402 (S.D.N.Y. 2012)...............................................................10

*SEC v. Gabelli*,
  653 F.3d 49 (2d Cir. 2011)..................................................................................19

*SEC v. Kameli*,
   No. 17 C 4686, 2020 WL 2542154 (N.D. Ill. May 19, 2020) ...........................23

*SEC v. Kenton Cap., Ltd.*,
  69 F. Supp. 2d 1 (D.D.C. 1998).........................................................................18

*SEC v. Rio Tinto PLC*,
  2021 WL 818745 (S.D.N.Y. Mar. 3, 2021) .......................................................23

*SEC v. RPM Int'l, Inc.*,
  282 F. Supp. 3d 1 (D.D.C. 2017)..........................................................2, 9, 17, 18, 32

*SEC v. SeeThruEquity, LLC*,
  No. 18 CIV. 10374 (LLS), 2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019)................23, 26

*SEC v. Strebinger*,
  114 F. Supp. 3d 1321 (N.D. Ga. 2015) ..............................................................23

*SEC v. Yuen*,
  272 F. App'x 615 (9th Cir. 2008).......................................................................10

## STATUTES

15 U.S.C. § 77k(a) .......................................................................................................20

## RULES

17 C.F.R. § 240.10b–5 ......................................................................................19, 22, 24

## OTHER AUTHORITY

*SEC v. Rio Tinto PLC*,
  21-2042 (2d Cir.) ...............................................................................................23

## INTRODUCTION

Defendant Kokorich's Motion to Dismiss the Complaint ("MTD") should be denied because Plaintiff Securities and Exchange Commission has sufficiently pleaded its claims of securities fraud and aiding and abetting securities fraud.  The Complaint alleges with particularity that Kokorich made untrue statements, omitted material facts necessary to make his statements not misleading, and engaged in other deceptive conduct related to a potential merger between Momentus, Inc., a space technology company he founded and served as Chief Executive Officer, and Stable Road Acquisition Corp., a publicly traded special-purpose acquisition company, or SPAC.  As announced, the merger would have resulted in Momentus becoming a public company, and would have greatly enriched Kokorich.  In pre-merger negotiations and investor presentations, Kokorich made misrepresentations or misleading omissions in two key areas: Momentus's failed 2019 in-space testing of a microwave electro-thermal ("MET") thruster, and Kokorich's own national security issues which cast doubt on his ability to legally reside in the United States and on Momentus's ability to participate in U.S.-based launches.  Kokorich also participated in the creation, editing, and approval of investor presentations and publicly filed registration statements about the merger in which Momentus made similar misrepresentations or misleading omissions.

Kokorich's Motion to Dismiss is premised on the incorrect assertion that Kokorich and Momentus only made true statements, and that no duty existed to disclose any additional facts. (MTD, 12).  In so doing, Kokorich misconstrues several of the Commission's allegations and wholly ignores certain alleged misrepresentations.  He also fails to acknowledge that the Commission explicitly pleaded that Kokorich and Momentus's omissions are actionable because the omitted facts were necessary to make their statements not misleading, and explained how those omissions misled investors.

Properly construed in accordance with Rule 12(b)(6), the Commission's Complaint plainly states each of its claims for relief.  The Commission respectfully requests that the Court deny Kokorich's Motion to Dismiss.

## THE COMPLAINT'S FACTUAL ALLEGATIONS[1]

### I.    Kokorich Negotiated a Merger Between Momentus and Stable Road from Which He Stood to Earn Millions

Founded in late 2017, Momentus describes itself as a space infrastructure company, which hopes to provide, among other things, satellite-positioning services. Compl., ¶ 16.  According to Momentus's plans, Momentus will integrate its customer's satellite into Momentus's vehicle, which will then be loaded onto a larger rocket. *Id.* at ¶ 18.  The rocket will then leave Momentus's vehicle in orbit, at which point Momentus will move its vehicle and the customer's integrated satellite into a custom orbit using what Momentus touted in investor presentations as its "cornerstone" technology, a propulsion system using MET water plasma thrusters. *Id.*  To execute this plan, Momentus must operate its MET water propulsion thruster reliably in space and provide the necessary thrust and length of operation needed to move customer satellites into specified orbits. *Id.*

In June 2020, Kokorich and Stable Road's CEO began to discuss a possible merger between the two companies. *Id.* at ¶ 46.  Over the next several months, Kokorich participated in merger negotiations with Stable Road and in presentations to Private Investment in Public Equity ("PIPE") investors, who committed to purchase shares of the post-merger company if the transaction was ultimately approved by shareholders. *Id.* at ¶¶ 46, 51.

---

[1] The allegations of the Complaint are accepted as true for purposes of deciding a motion to dismiss. *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 12 (D.D.C. 2017).

Momentus and Stable Road announced their merger on October 7, 2020. *Id.* at ¶ 52.  The merger agreement, if approved by Stable Road's shareholders, would essentially take Momentus public and generate millions of dollars for Kokorich. *Id.* at ¶ 7.  That day, Kokorich participated in a presentation to analysts and institutional investors using slides virtually identical to the ones shown to PIPE investors. *Id.*  Stable Road filed a copy of these slides and the presenters' script with the SEC on a publicly-available Form 8-K later that day. *Id.* at ¶ 52.

Stable Road publicly filed an initial S-4 registration statement related to the merger with the SEC on November 2, 2020, and a subsequent amended registration statement on December 14, 2020. *Id.* at ¶ 53.

In merger negotiations with Stable Road and in investor presentations, Kokorich made misrepresentations of material fact and omitted material facts necessary to make his statements not misleading.  The relevant misrepresentations and misleading omissions related to two topics: 1) Momentus's 2019 in-space testing of a MET thruster; and 2) various adverse determinations against Kokorich or Momentus for national security reasons.  Kokorich additionally participated in the creation, review and approval of the November 2, 2020 and December 14, 2020 registration statements, which also contained material misrepresentations and misleading omissions related to these two topics.

## II.   Kokorich Made Fraudulent Misrepresentations and Engaged in Other Deceptive Conduct Related to Momentus's 2019 In-Space Testing

### a.   Momentus Defined Mission Success Modestly But Inflated External Expectations

In July 2019, Momentus launched an MET thruster on the "MX-1" satellite for the purpose of testing the thruster in space and performing maneuvers. *Id.* at ¶ 22.  Prior to the July 2019 test launch, in an internal slide presentation, Momentus defined "mission success" in part as "100

individual burns of 1 minute of more." *Id.*  A "burn" refers to operating the thruster and producing thrust for a period of time. *Id.*

Internally, Momentus executives understood that the test mission, which it named "El Camino Real," was not meant to establish the thruster's commercial viability. *Id.* at ¶ 25.  The thruster being tested was not powerful enough to provide any measurable or detectible changes in the MX-1 satellite's orbital velocity. *Id.*  As one former Momentus officer stated, the thruster did not have "commercial potential" because it was "too small, too inefficient, too low in [specific impulse], too low in total impulse." *Id.*  By his own admission, Kokorich understood even before the launch that the mission was not designed to show that the thruster could provide measurable delta-v (the change in velocity from thrust), to measure specific impulse (the efficiency of the propulsion system), or to show the thruster's reliability. *Id.* at ¶ 30.

Nevertheless, before the launch, the public was conditioned to believe that the test mission would actually demonstrate the thruster's commercial viability. *Id.* at ¶ 23.  In a January 2019 blog post on its website, Momentus stated that the mission would give investors "absolute confidence" that Momentus's service would be "on time, safe and reliable." *Id.*  Momentus also said that it would "be able to run the thruster long enough to fully characterize its performance in space with dozens of stop start cycles and [to] then safely de-orbit the vehicle." *Id.*

Additionally, through its launch partner Astro Digital US, Inc., Momentus stated in a publicly filed Federal Communications Commission ("FCC") application on September 12, 2018, that El Camino Real was "a commercial demonstration" of Momentus's propulsion system that would show its "reliability, longevity, performance, and utility." *Id.* at ¶ 24.  The FCC application stated that the mission's objective was to demonstrate that its thrusters provide "cost-effective high delta V [change in velocity from thrust] capability" and thereby show that "this particular system

is mature enough to be used by the small satellite market, and can be quickly and easily integrated with CubeSats as well as larger, more capable spacecraft." *Id.*

### b. The Mission Failed to Meet Momentus's Pre-Launch Standard for Success or Heightened External Expectations

The El Camino Real mission failed to meet Momentus's internal criteria for mission success, as set forth in its internal slide presentation. *Id.* at ¶ 26.  After experiencing significant problems with supporting sub-systems and its propulsion system, Momentus attempted only 23 firings, and data suggests that only three firings produced plasma.  None of those firings lasted a full minute or generated measurable thrust.  *Id.*  Momentus lost contact with the satellite approximately three months into the planned six-month mission and was never able to attempt the remaining 77 firings it had planned, much less achieve any of the "100 individual burns of 1 minute or more." *Id.*

Internally, Momentus recognized that the mission was a failure.[2]  Kokorich was copied on emails in November 2019 between Momentus's Chief Technology Officer and its Chief Engineer discussing creation of a "failure review board" to study the El Camino Real mission, due to the inability to obtain useful data from the mission because of its failure. *Id.* at ¶ 30.  In addition, one Momentus engineer internally acknowledged in February 2020, in a document sent to Kokorich, that Momentus did not obtain "any useful mission results" from the launch. *Id.*

---

[2] Kokorich asserts that the Commission misconstrued this email exchange to suggest "that the proposal for a 'failure' review board' covered the water propulsion MET system," as opposed to the launch vehicle. MTD, p.8.  In fact, the Commission alleged merely that the exchange, which has the subject line, "Need El Camino Real Failure Review Board," put Kokorich on notice that the mission as a whole was a failure. Compl. ¶ 30; Gorman Decl., Ex. 2.

The mission also fell short of the standards Momentus publicly established in its blog post and FCC license.  Momentus did not perform "dozens of start and stop cycles" or "safely deorbit" the vehicle, as represented in its January 2019 blog post. *Id.* at ¶ 27.

The El Camino Real mission certainly did not demonstrate the commercial viability of the thruster tested.  According to a former Momentus officer, the mission yielded "no data to suggest that that thruster would deliver an impulse of any commercial significance," and Momentus was not able to characterize the performance of the thruster. *Id.* at ¶ 29.  According to a Momentus engineer, the mission did not yield sufficient data to demonstrate the propulsion system's reliability or longevity. *Id.*

### c. Kokorich Boasted of Mission Success in 2019, Misrepresenting that the Mission Had Met the Heightened External Expectations

Even though Kokorich understood all along that the El Camino Real mission could not demonstrate the commercial viability of the thruster tested, he exacerbated the public mischaracterization of the mission.  In a September 25, 2019, article in the industry periodical Space News titled, "Momentus reports success in testing water plasma propulsion," Kokorich was quoted as stating, "Water plasma propulsion is now technologically mature enough to be baselined for operational in-space transportation missions," meaning it could be used commercially. *Id.* at ¶ 31.  He also repeated the claim from Momentus's January 2019 blog post that "the purpose of the El Camino Real mission was to flight demonstrate our core propulsion technology so customers, investors and stakeholders can have absolute confidence that Momentus will deliver their payloads to a given orbit." *Id.*

### d. Kokorich Misled Stable Road, PIPE investors, and Retail Investors Regarding the Test Mission

Kokorich told Stable Road's CEO during their first meeting in June 2020 that the El Camino Real mission had been a success and that it was a great achievement for Momentus to

have fired the thruster and tested its propulsion technology in space. *Id.* at ¶ 48.   Specifically, Kokorich said that Momentus had performed a number of tests, with recorded data, and that the vehicle was still in space although they could no longer conduct additional tests. *Id.*

Kokorich also discussed the "success" of the El Camino Real mission in multiple presentations to PIPE investors. *Id.* at ¶ 51.   On October 7, 2020, the day the merger was announced, Kokorich and Stable Road's CEO made a presentation on a conference call to equity analysts and institutional investors using slides virtually identical to the ones shown to PIPE investors. *Id.* at ¶ 52.   Stable Road filed a copy of these slides and the presenters' script with the SEC on a publicly-available Form 8-K later that day. *Id.*   Slide presentations provided to PIPE investors and the presentation filed with SEC on October 7, 2020, claimed that Momentus "successfully tested water based propulsion technology on a demo flight launched mid-2019 – is still operational today." *Id.*   In his scripted comments on October 7, 2020, Kokorich also said that Momentus had "successfully tested our groundbreaking thruster in space." *Id.*

Kokorich's claims to Stable Road's CEO and to PIPE investors that the mission had been a success was false because the mission failed Momentus's criteria for success.   It was also misleading under the circumstances because Kokorich and Momentus had set public expectations (in the blog post, the FCC application, and Kokorich's statements to the press) that the mission would demonstrate the commercial viability of the thruster, and Kokorich did not disclose that the mission wholly failed to meet those expectations.   His statement that Momentus had performed a number of tests was misleading because Kokorich omitted that Momentus had only been able to attempt 23 of 100 planned test fires and that the thruster had failed most of those tests – out of 23 test fires, the thruster only arguably produced plasma just three times. *See id.* at ¶ 26.

7

Additionally, the November 2, 2020 and December 14, 2020 registration statements each contain a subsection titled, "Information about Momentus," that Momentus drafted with Kokorich's input, review and approval. *Id.* at ₧ 55.   In this subsection of each registration statement, Momentus stated that it "successfully tested our water plasma propulsion technology in space," referring to the El Camino Real mission. *Id.*   Each subsection also contains a graphic captioned: "Our water plasma propulsion technology." *Id.* at ₧ 56.   In the body of the slide there is a diagram of a thruster surrounded by various claims about the thruster's functionality, including: "High ISP – Tunable up to 2 to 5 times common chemical propulsion systems"; and "High thrust – Tunable up to 3 to 10 times most common electrical propulsion systems":



*Our water plasma propulsion technology*

*Id.*; Form S-4, Registration Statement, filed by Stable Road Acquisition Corp., Nov. 2, 2020, p. 189, available at

https://www.sec.gov/Archives/edgar/data/1781162/000121390020034368/fs42020_stableroadac

q.htm (last visited October 22, 2021), p. 189.[3]

Momentus's characterizations of the El Camino Real mission in the registration statements were false and misleading. Compl., ⁋ 57.  The claim of success was false and misleading for the reasons explained above. Further, Momentus claimed that its "water plasma propulsion technology" was successfully tested in space in 2019 and subsequently boasted in its graphic that its "water plasma propulsion technology" offered high thrust and high ISP (specific impulse). *Id.* By linking the 2019 testing and the claims in the graphic by using the same verbiage, "our water plasma propulsion technology," Momentus misleadingly implied that the 2019 failed test in space supported the claims in the graphic when in fact it did no such thing.  Specifically, the El Camino Real mission did not demonstrate high thrust or high specific impulse.  It also did not demonstrate that the thruster it tested was "tunable up to 2 to 5 times common chemical propulsion systems" or "up to 3 to 30 times most common electrical propulsion systems." *Id.*

On June 29, 2021, after Kokorich left his position as Momentus's CEO, Stable Road and Momentus filed with the SEC an amended registration statement that corrected these false statements and misleading omissions by describing the actual results of the El Camino Real mission. *Id.* at ⁋ 60.  The registration statement explained that "[t]he mission's objective was to demonstrate the MET's ability to produce water plasma in space by performing 100 one minute firings." *Id.*  After discussing the failure of the MX-1 satellite, and the associated problems with the attempted firings of the thruster which were stopped "after only 23 of the planned 100 firings had been performed," the statement clarified that "a pump issue significantly restricted flow of

---

[3] In deciding a motion to dismiss, the Court may consider documents attached to or referred to in the complaint. *RPM*, 282 F. Supp. 3d at 12.  Kokorich agrees. *See* MTD, p. 3, n. 1.

water into the thruster during nine of the 12 hot firings, preventing plasma generation" and that

"the three hot firings that did have water present were found to have produced plasma." *Id.*[4]

III.   **Kokorich's Fraudulent Misrepresentations and Other Deceptive Conduct Related to Adverse Determinations Against Him for National Security Reasons**

a.   **Since 2018, Multiple Government Agencies Have Made Adverse Determinations Against Kokorich for National Security Reasons**

Because Kokorich is a Russian citizen, he could not access certain of Momentus's

technology without an export control license. *Id.* at ⁋ 35.  In 2017, Momentus (then operating under

the name "Space Apprentices Enterprise") applied for such a license on Kokorich's behalf. *Id.*  In

March 2018, the U.S. Department of Commerce's Bureau of Industry and Security ("BIS"), denied

the application. *Id.*  In its rejection notice to Momentus, BIS explained that, after consulting with

the Departments of Defense and State, it had concluded that Kokorich was not an "acceptable

recipient" of the technology "for national security reasons." *Id.*

---

[4] Kokorich requests in a footnote that the Court "dismiss" paragraph 60 of the Complaint because "remedial efforts are not admissible when considering liability for a claim," citing *Carey-Canada, Inc. v. California Union Ins. Co.*, 118 F.R.D. 242, 245, n. 10 (D.D.C. 1986). As that court explained, the general policy behind this rule is that people should not be discouraged from remedying problems by having their remedial efforts used against them. *See* Fed. R. Evid. 407, Advisory Committee Note.  Nevertheless, the *Carey-Canada* court did not dismiss all or part of any claim, and in fact *allowed* discovery on revisions to the defendant insurance company's policies. 118 F.R.D. at 245, n. 10.  Additionally, the Commission does not allege that Kokorich undertook any "remedial" measures; indeed, he did not.  Compl., ⁋ 60.

Moreover, evidence related to an issuer's corrective disclosures are admissible in securities fraud cases. *See, e.g., SEC v. Yuen*, 272 F. App'x 615, 618 (9th Cir. 2008); *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 901-04 (S.D. Cal. 2019); *SEC v. Espuelas*, 908 F. Supp. 2d 402, 409–10 (S.D.N.Y. 2012).  Here, the June 29, 2021 registration statement is evidence of the actual results of the mission, regardless of whether it also shows the falsity of any prior statements.

**APPLICANT:** S715298
Space Apprentices Enterprise
11801 Francemont Drive
Los Altos Hills, CA 94022
United States
**ATTN:** Jennifer Smith

**ULTIMATE CONSIGNEE:**
Mikhail Kokorich
11801 Francemont Drive
Los Altos Hills          , CA 94022
Russia Federation

**REASON:**
After reviewing your application for commodities classified under 9x515 (¿515 commodities¿),
the Department of Commerce, in consultation with the Department of Defense and the
Department of State, denies the application referenced above at this time. Pursuant to Section
3(2)(A) and 5(a) of the EAA, the Department has concluded that the ultimate consignee is not an
acceptable recipient at this time of U.S.-origin items controlled for national security reasons.

Declaration of Melissa Armstrong ("Armstrong Decl."), Exh. 1.

The next month, in April 2018, the Committee on Foreign Investment in the United States

("CFIUS"), an intergovernmental agency that includes the U.S. Departments of Commerce,

Defense, and State, among others, sent a letter to Kokorich relating to his investment in Astro

Digital, another space technology he had founded. Compl. ¶ 36.  In that letter, CFIUS informed

Kokorich that it "believe[d]" his investment and the investments of certain others "pose[d] a risk

to the national security of the United States." *Id.*

On or about June 22, 2018, CFIUS representatives participated in a teleconference with

Kokorich's attorneys. *Id.* at ¶ 37.  On that call, CFIUS representatives informed Kokorich's

attorneys that CFIUS had determined that a full divestiture of Kokorich's participation in Astro

Digital was necessary to mitigate the national security concerns. *Id.*

After the teleconference, in a letter response dated June 24, 2018, on which Kokorich was

copied, Kokorich's attorneys stated that they understood that CFIUS had deemed Kokorich a

national security risk and tried to persuade CFIUS to reconsider this determination:

> During the teleconference, CFIUS informed us that it is preparing to
> order the Kokoriches to divest their ownership interest in Astro Digital.
> According to your colleagues, CFIUS has concluded that the Kokoriches
> present a threat to the national security of the United States….

*Id.* at ℙ 38; Armstrong Decl., Exh. 2, p. 2.

In the same letter, Kokorich's attorneys argued that he should not be considered a national security risk—but a national security asset—because he was purportedly a vocal critic of the Russian government.  *Id.*

Kokorich's argument did not work. Compl., ℙ 39.  In a letter dated June 25, 2018, CFIUS told Kokorich that it would require him to divest his ownership and control interest in Astro Digital.  *Id.*  CFIUS explained that its concerns related, in part, to the sophistication of the company's technology and concerns involving Kokorich and other foreign investors. *Id.*

In or about June 2018, U.S. Customs and Immigration Services ("USCIS") revoked Kokorich's work visa and denied his application for permanent resident status. *Id.* at ℙ 40.  In response, Kokorich applied for political asylum and withholding of removal proceedings in September 2018, claiming again that he was a prominent critic of the Russian government, the very argument that had failed to persuade CFIUS just three months earlier. *Id.*

A year later, on or about August 28, 2019, USCIS issued a referral notice informing Kokorich that it had not granted his asylum application, and that it had referred his case to an immigration judge for adjudication in removal proceedings. *Id.* at ℙ 41.  USCIS stated that its determination was based on "inconsistencies" in Kokorich's application and testimony "with regard to [his] political affiliations and activities in Russia." *Id.*

In February 2020, Momentus filed a new application for an export control license for Kokorich. *Id.* at ℙ 69.  On October 7, 2020, the day Momentus and Stable Road announced their merger, a BIS representative emailed Momentus to convey, in part, that the Departments of Defense and State had indicated that they would recommend denying the application. *Id.*  Two days later, the same representative further disclosed that the Departments of Defense, State, and

Energy had all recommended denying the application. *Id.*  On October 23, 2020, the representative emailed to disclose that BIS's Operating Committee had determined to deny the license, although the representative indicated the possibility that he might seek to appeal that decision internally. *Id.* Thus, by the time Stable Road filed its first registration on November 2, 2020, Kokorich knew that he had been previously denied an export control license for national security reasons and that the Department of Defense had recently recommended denying his second application.

On November 9, 2020, Momentus and Kokorich learned that there would be no internal appeal and that the Department of Commerce would deny Momentus's pending application for an export control license for Kokorich.  On November 12, 2020, Momentus received the formal notification of the intent to deny the application. *Id.* at ¶ 70; Armstrong Decl., Exh. 3.  That letter notification stated that Momentus's technology would make a "significant contribution to the military potential to any other country or combination of countries which would prove  detrimental to the national security of the United States" and that Kokorich was not an acceptable recipient of Momentus's technology. *Id.*

**b.  Adverse National Security Determinations Against Kokorich Threatened Momentus's Viability**

Before it is able to launch any vehicle on a U.S. mission, Momentus or its launch partners must obtain licenses from various U.S. government agencies, including the Federal Aviation Administration ("FAA").[5]  *Id.* at ¶ 63.  Those agencies have the authority to deny a license for

---

[5] Kokorich's implication that any U.S. government agency approved Momentus's participation in the mission from a national security perspective (MTD at 6-7) cannot be inferred from the facts alleged in the Complaint. The El Camino Real Mission was not a U.S. mission. It launched from Kazakhstan on a Soyuz rocket. Armstrong Decl., Exh.4, p. 5.  The Commission has not alleged that Astro Digital or Momentus had to obtain a license from the FAA for the El Camino Real mission, and in fact, they did not.  Furthermore, although the FCC application for the El Camino Real mission refers extensively to the "Momentus X1 Spacecraft," it does not mention Momentus, Inc. or any of its personnel (including Kokorich) by name or specifically disclose that any third-

national security reasons and work in consultation with the U.S. Department of Defense to determine if the payload of a mission presents a national security risk. *Id.*

If Momentus or its launch partner is unable to obtain the necessary licenses, Momentus cannot execute its business plan. *Id.* at ¶ 64.  It may be unable to conduct additional missions to test its technology.   It may also never be able to offer commercial satellite placement services. *Id.*

The U.S. government's national security-related determinations about Kokorich therefore posed a significant threat to Momentus's ability to participate in launches and generate meaningful revenue and were material. *Id.* at ¶ 65.

### c. Kokorich Misled Stable Road, PIPE investors, and Retail Investors Regarding His National Security Problems

From the beginning of the merger discussions, Kokorich told Stable Road's CEO that he was confident that his asylum application would be approved as he purportedly had a strong case for political asylum. *Id.* at ¶ 66.  That statement was misleading because Kokorich did not tell Stable Road's CEO that the USCIS had previously issued a referral notice saying that it had not granted his asylum application, and that it had referred his case to an immigration judge for adjudication in removal proceedings. *Id.* at ¶ 67.  It was also misleading because Kokorich knew about the previous adverse determinations against him for national security reasons, all of which undermined any basis for his belief that he had a strong case for political asylum. *Id.* at ¶ 68.

Kokorich also assured Stable Road's CEO that the CFIUS divestiture order regarding Astro Digital was closed, and that it was a different situation from his Momentus ownership. *Id.* at ¶ 67. Kokorich asserted that the issues CFIUS raised in the prior matter had to do with other investors,

---

party company owned the thruster being tested. *See generally, id.* The entire FCC application is available at https://fcc.report/ELS/Astro-Digital-US-Inc/0698-EX-CN-2018 (last visited October 22, 2021).

not specifically him. *Id.*  That statement was false.  As Kokorich knew or was reckless in not knowing based on CFIUS's communications with his counsel, the prior divestiture order was squarely related to national security concerns related to Kokorich himself. *Id.*

The November 2, 2020 and December 14, 2020 registration statements also contain material misrepresentations or material omissions related to Kokorich's national security issues. In the "Information about Momentus" subsection, which Momentus drafted with Kokorich's input, review and approval, Momentus stated that it believed Kokorich's asylum application would be granted. *Id.* at ¶ 79.  That statement was misleading for the reasons stated above.

Additionally, in the "Risk Factors" subsection, which Momentus also drafted and which Kokorich reviewed and did not correct, Momentus disclosed to potential investors that Kokorich had not "yet" obtained an export control license. *Id.* at ¶ 80.  Momentus omitted, however, that the BIS had denied Momentus's first application in 2018 because of national security issues. *Id.*  It also omitted that, at the time of the first registration statement, Momentus's pending application had been placed on hold or that, at the time of the second registration statement, BIS had communicated its intent to deny the application for national security reasons. *Id.*  Those omissions were materially misleading because they left investors with the impression that Momentus anticipated that Kokorich would ultimately receive an export control license, when in fact the company had no basis for that expectation given Kokorich's national security problems. *Id.*

Both the initial and first amended S-4 registration statements included aggressive revenue projections for Momentus, forecasting that the company would grow from zero revenues in 2019 to revenues of over $4 billion in 2027. *Id.* at ¶ 81.  Those projections were materially misleading, however, because they failed to disclose that Kokorich's ownership and leadership of the company

jeopardized Momentus's ability to earn *any* revenue from U.S.-based launches, and Momentus only had U.S.-based launches planned at the time. *Id.*

### d. Subsequent Events Bore Out the Risk that Kokorich's National Security Problems Posed to Momentus

The growing issues that Momentus faced by having Kokorich as a CEO came to a head in December 2020, just two months after the merger announcement. *Id.* at ¶ 71.  Momentus was scheduled to participate in a launch with a large commercial launch provider in January 2021. That launch represented a key milestone for Momentus because it was supposed to be the company's first commercial flight. *Id.*

On December 22, 2020, the FAA notified the launch provider that it would not approve the upcoming rocket launch with Momentus's payload on board. *Id.* at ¶ 72.  As a result, the launch provider removed Momentus's payload from its rocket and proceeded with the launch.  On January 4, 2021, Momentus issued a press release stating that it was "remanifesting its January 2021 mission to a subsequent launch opportunity in 2021," which would "allow for the additional time necessary to secure FAA approval of Momentus's payloads." *Id.*  On January 7, 2021, the FAA sent a letter to the launch provider explaining that the Department of Defense had identified potential national security concerns with Momentus's payloads and that it could not approve the provider's launch if it included Momentus's payload because the Department of Defense's review would not be complete before the launch date. *Id.*

Shortly after this setback, on January 21, 2021, Momentus learned of a letter from the Department of Defense stating that Momentus posed a risk to national security as a result of Kokorich's ownership and control of the company. *Id.* at ¶ 73.  On January 25, 2021, Kokorich stepped down as CEO of Momentus and placed his shares of Momentus stock in a voting trust. *Id.*

Even that did not solve Momentus's problems, however. *Id.* at ¶ 74.  In May 2021, the FAA once again did not approve Momentus's participation in a June 2021 launch with the launch provider. *Id.*  On May 10, 2021, Momentus received a letter from the U.S. Federal Aviation Administration ("FAA") denying Momentus's application for a payload review. *Id.*  The FAA explicitly based its denial on a finding that the launch of Momentus's payload would jeopardize national security due to Momentus's then-current corporate structure. *Id.* at ¶ 75.

Later in May 2021, the launch provider informed Momentus that it would not allow any Momentus payload on any launch through the end of the year while Momentus "works to secure approvals from the U.S. government." *Id.* at ¶ 76.  Momentus's best-case scenario, therefore, is an inaugural commercial launch in January 2022, a full year after Momentus hoped to begin offering commercial services. *Id.*

On June 9, 2021, Kokorich and Momentus entered into a National Security Agreement with CFIUS, pursuant to which Kokorich agreed to fully divest from the company and Momentus agreed, among other things, to implement increased security measures and appoint a CFIUS-approved director to its board of directors. *Id.* at ¶ 77.

## LEGAL STANDARDS

A court may dismiss a complaint only if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  When considering a motion to dismiss under Rule 12(b)(6), the Court must accept the allegations in the complaint as true, liberally construe the complaint in the plaintiff's favor, and grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 12 (D.D.C. 2017).  The court may consider "only the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Id.* (internal quotation omitted).

Federal Rule of Civil Procedure 9(b) imposes heightened pleading standards in fraud cases, as plaintiffs must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Those circumstances include matters such as the "time, place, and contents of the false representations, such representations being the element of fraud about which the rule is chiefly concerned." *U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002). The D.C. Circuit applies Rule 9(b)'s pleading standards to claims of misrepresentation under Section 10(b) of the Exchange Act, and other courts in this district also apply it to claims under Section 17(a) of the Securities Act. *See RPM*, 282 F. Supp. 3d at 12.

## ARGUMENT

### I.    The Commission Has Alleged Primary Violations of the Antifraud Statutes

#### a.   The Elements of Securities Fraud

Counts I and II of the Complaint allege violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder as well as Section 17(a) of the Securities Act.  In all relevant respects for purposes of Kokorich's Motion to Dismiss, the elements of the Commission's claims under Sections 10(b) and 17(a) are the same and will be discussed interchangeably. *See* MTD, p. 13. *See also SEC v. Kenton Cap., Ltd.*, 69 F. Supp. 2d 1, 7–8 (D.D.C. 1998) ("Sections 17(a) and 10(b) establish very similar requirements for proof of securities fraud.").

Rule 10b-5 provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To state a claim under Rule 10b-5, the Commission must allege that the defendant: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69, 80 (D.D.C. 2014) (Boasberg, J.). Kokorich's motion to dismiss challenges only the adequacy of the Commission's allegations relating to the first of these elements.

### 1. Opinion Statements, Misleading Omissions, and *Omnicare*

A statement constitutes a material misrepresentation for purposes of Rule 10b-5(b) if it is "either 'untrue' outright or 'misleading' by virtue of what it omits to state." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016). Omissions of "material fact necessary in order to make the statements made…not misleading" are distinct from "pure omissions," or the "complete failure to make a statement," which are only actionable if the defendant is "subject to a duty to disclose the omitted facts." *Id.* "The law is well settled ... that so-called half-truths—literally true statements that create a materially misleading impression—will support claims for securities fraud." *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, *Gabelli v. SEC*, 568 U.S. 442 (2013) (internal quotation marks omitted)).

The Supreme Court's opinion in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), is particularly instructive on two interrelated issues relevant in this case: (1) when statements of opinion or belief constitute actionable misrepresentations; and (2) when misleading omissions of material facts constitute actionable misrepresentations. *Omnicare* arose under Section 11 of the Securities Act, which provides that if a registration statement "contain[s] an untrue statement of a material fact" or "omit[s] to state a material fact ...

19

necessary to make the statements therein not misleading," a purchaser of the stock may sue for damages. 15 U.S.C. § 77k(a).  Although it involves a different section of the Securities Act, *Omnicare* is regularly cited as controlling authority regarding material misrepresentations in cases alleging fraud because of the parallel language of Section 11 and that of Section 17(a) and Rule 10b-5. *See, e.g., Vivendi* at 243–44.

The plaintiffs in *Omnicare* alleged that two representations in the relevant registration statements were false and misleading:

- "We believe our contract arrangements with other healthcare providers, our pharmaceutical suppliers and our pharmacy practices are in compliance with applicable federal and state laws."

- "We believe that our contracts with pharmaceutical manufacturers are legally and economically valid arrangements that bring value to the healthcare system and the patients that we serve."

*Id.* at 179-80.  In deciding that these statements could constitute material misrepresentations, the Court first used two hypothetical statements to parse the difference between statements of fact and statements of opinion or belief:

A company's CEO states: "The TVs we manufacture have the highest resolution available on the market." Or, alternatively, the CEO transforms that factual statement into one of opinion: "I *believe*" (or "I think") "the TVs we manufacture have the highest resolution available on the market."

*Id.* at 183. The Court explained that only the first statement may constitute a material misrepresentation *merely* by virtue of being incorrect, i.e., there being a higher resolution TV available from a competitor. *Id.* at 183-84.

The Court then explained three ways that a statement of opinion or belief *could* constitute a material misrepresentation.  First, a statement of belief or opinion can be actionable if the speaker knows it is incorrect. *Id.* at 184.  To continue the Court's example, if the CEO knows that a competitor offers a higher resolution TV, the statement of belief or opinion is untrue and

actionable. *Id.*   Second, liability could arise if the statement of opinion or belief contains "embedded statements of fact," and one or more embedded statement is untrue. *Id.* at 185.  Again, the Court's example is illustrative: If the hypothetical CEO said: "I believe our TVs have the highest resolution available because we use a patented technology to which our competitors do not have access," and if the company did not in fact have patented technology, the statement would be actionable. *Id.*   Third, a statement of opinion or belief may also constitute a material misrepresentation if the speaker omits material facts that undermine the basis of that opinion:

> [A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience. Consider an unadorned statement of opinion about legal compliance: "We believe our conduct is lawful." … [I]f the issuer made the statement . . . with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain:  He expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.

*Id.* at 188-89.  The essential question is whether the omitted facts regarding the basis of the speaker's opinion "conflict with what a reasonable investor would take from the statement itself." *Id.* at 189.

To bolster its interpretation of Section 11, the Court looked to various principles of common law fraud.  First, "the expression of an opinion may carry with it an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it." *Id.* at 191 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Torts § 109, p. 760 (5th ed. 1984)).  Second, "omissions relating to an opinion's basis are 'particularly' likely to give rise to liability when the speaker has 'special

knowledge of facts unknown to the recipient.'" *Id.* at 192 (quoting Restatement (Second) of Torts § 539, Comment b, p. 86 (1976)).

### 2. Deceptive Conduct and *Lorenzo*

While Rule 10b-5(b) refers specifically to untrue statements or misleading omissions, Rule 10b-5(a) and (c) prohibits a broader range of deceptive conduct, whether employing a "device, scheme, or artifice to defraud" or engaging in an "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 CFR §§ 240.10b-5(a) and (c). These provisions are "expansive" and "capture a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019). A scheme, for example, is simply a "project, plan, or program of something to be done," and an artifice is "an artful stratagem or trick." *Id.* (cleaned up).

In *Lorenzo*, the Supreme Court held that a person who disseminates material misrepresentations may be liable under Rules 10b-5(a) and (c) and Section 17(a)(1), even if he does not "make" those statements for purposes of Rule 10b-5(b). *Id.* at 1099. After *Lorenzo*, most courts properly reject the argument that the Commission must allege additional deceptive conduct beyond material misrepresentations to state a claim under Rule 10b-5(a) and (c).[6] *See, e.g., In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) (Plaintiffs stated a claim under Rules 10b-5(a) and (c) where they alleged material misrepresentations, as Lorenzo rejected the argument that these provisions "are violated only when conduct other than misstatements is involved."); *SEC v. Complete Bus. Sols. Grp.*, No. 20-81205, 2021 WL 1907020, at *19 (S.D. Fla. May 11, 2021) (It is "no longer tenable in light of *Lorenzo*" to "adopt[] the position that Rule 10b-5(a) and (c)

---

[6] In *Lorenzo*, the Supreme Court affirmed the decision of the D.C. Circuit. The circuit court opinion similarly supports the proposition that "conduct potentially subject to Rule 10b-5(b)'s bar against making false statements can also fall within Rule 10b-5(a)'s more general prohibition against employing fraudulent devices." *Lorenzo v. SEC*, 872 F.3d 578, 591 (D.C. Cir. 2017), *aff'd*, 139 S. Ct. 1094 (2019).

require deceptive acts distinct from the alleged misrepresentation forming the basis of a Rule 10b-5(b) claim."); *SEC v. Kameli*, No. 17 C 4686, 2020 WL 2542154, at *14 (N.D. Ill. May 19, 2020) (*Lorenzo* "permits liability under Rule 10b-5(a) and (c) for both making and disseminating misleading statements."); *SEC v. SeeThruEquity*, *LLC*, No. 18 CIV. 10374 (LLS), 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019) (denying motion to dismiss where complaint alleged that "defendants repeatedly made false or misleading statements in their research reports, press releases, and website"). *But see SEC v. Rio Tinto PLC*, 2021 WL 818745, at *2–3 (S.D.N.Y. Mar. 3, 2021) ("The Court disagrees with the SEC's contention that *Lorenzo* holds that misstatements can form the basis for liability under Rule 10b-5(a) and (c).").[7]  Even before *Lorenzo*, some courts held that a plaintiff could allege violations of Rules 10b-5(a) and (c) where the defendant participated in the creation of third-party documents containing misleading misrepresentations, even if the defendant did not "make" the misstatements therein. *SEC v. Strebinger*, 114 F. Supp. 3d 1321, 1331 (N.D. Ga. 2015) (defendant engaged in deceptive conduct by supplying information for investor reports, editing drafts, and determining when reports were complete).  These courts reason that so long as the alleged misrepresentations constitute a scheme to defraud or otherwise satisfy the language of Rule 10b-5(a) and (c), the plaintiff can state a claim under these provisions based solely on alleged misrepresentations. *Puddu v. 6D Glob. Techs., Inc.*, No. 15-CV-8061 (AJN), 2021 WL 1198566, at *11 (S.D.N.Y. Mar. 30, 2021).

---

[7] The Second Circuit has agreed to hear the Commission's interlocutory appeal of the court's opinion in *Rio Tinto*. *SEC v. Rio Tinto PLC*, 21-2042 (2d Cir.). The Commission filed its brief on September 23, 2021. Oral argument has not yet been scheduled.

b. **The Commission Has Alleged Primary Violations By Kokorich Related to the 2019 In-Space Testing of Momentus's Thruster**

1. **The Commission Has Sufficiently Pleaded that Kokorich Made Misrepresentations**

Kokorich's own statements to Stable Road's CEO and PIPE investors related to the El Camino Real mission constitute material misstatements under *Omnicare*. First, Kokorich's claim that Momentus "successfully tested" its thruster in space was either a false statement of fact or a statement of belief Kokorich knew was false, as described in *Omnicare*. *See Omnicare*, 575 U.S. 183-84. Momentus established objective criteria for mission success, it did not meet those criteria, and the test mission was therefore a failure. Furthermore, Kokorich knew the testing was not successful because he was aware of the actual test results and that Momentus's top engineers described the mission as a failure.

Second, Kokorich's claim of success was misleading because it did not "fairly align[]" with the information that was in his possession but which he chose to omit from his statements. *See Omnicare*, 575 U.S. 189. For instance, Kokorich knew that Momentus did not meet its *internal* criteria for success, whereas a reasonable investor would understand from his statement that it had. *See id.* He knew that Momentus attempted only 23 firings, and that data suggests that at best only three firings products plasma. Compl. ¶¶ 26, 30. He knew that the mission was characterized internally at Momentus as a failure. *Id.* at ¶ 30. And he knew that the Momentus did not obtain "any useful mission results" from the launch. *Id.* Those facts do not "fairly align[]" with Kokorich's unqualified boast that the testing was successful.

Kokorich's statement was especially misleading because of the "circumstances under which [it was] made." *See* 17 CFR § 240.10b-5(b). In 2019, Momentus and Kokorich set *public* expectations for the test mission, and Kokorich knew, but misleadingly omitted to state, that the mission failed to meet those expectations. The relevant "circumstances" under which Kokorich

made his statements included the Momentus blog post, the FCC application for the El Camino Real mission, and Kokorich's own statements in the SpaceNews article, all of which led the public to believe that the test mission would demonstrate that the thruster was ready for commercial use. Compl. ₱₱ 23-24, 31.  To take the SpaceNews article as an example, Kokorich stated that "the purpose of the El Camino Real mission was to flight demonstrate our core propulsion technology so customers, investors and stakeholders can have absolute confidence Momentus will deliver their payloads to a given orbit."  Under those circumstances, a reasonable investor would understand that a "successful" test mission achieved its stated purpose.  For Kokorich to claim that the test flight was a success while omitting to state that it in no way achieved its purported purpose—as he himself previously characterized it—is misleading by omission.

Similarly, Kokorich's statement to Stable Road's CEO that Momentus had performed a number of tests during the El Camino Real mission was misleading because Kokorich omitted to state that the thruster had *failed* most of those tests, whereas a reasonable person or investor would infer the opposite.

### 2. The Commission Has Sufficiently Pleaded that Kokorich Employed a Fraudulent Scheme and Engaged in Deceptive Acts, Practices or Courses of Business

The Commission has alleged a fraudulent scheme and/or fraudulent acts or practices by Kokorich related to the 2019 in-space testing.  In addition to making his own misrepresentations, Kokorich participated in the preparation of the November and December 2020 registration statements.  He helped draft and then reviewed and ultimately approved Momentus's portion of the registration statements, including portions that contain material misrepresentations about Momentus's 2019 in-space testing.  Those misrepresentations include both the general claim that Momentus "successfully tested our water plasma propulsion technology in space," which is false and/or misleading for the reasons statement above.  The misleading portion of the registration

statements Kokorich helped draft and review also includes the specific claims in the graphic labeled, "Our water plasma propulsion technology," which the in-space testing wholly failed to support.  When Momentus, with Kokorich's review and approval, said that it successfully tested its water plasma propulsion technology in space, it misleadingly omitted to state that this did not mean that it had proved the thruster could perform as claimed in the graphic.   This was a material omission that made Momentus's statements misleading.

From June 2020 (when merger negotiations began) through November 2020 (when the second registration was filed), Kokorich deceived Stable Road, PIPE investors, and retail investors through a combination of his own material misrepresentations and his participation in the creation, review and/or approval of investor presentations and registration statements that contained material misrepresentations.  Because Kokorich misled Stable Road and its CEO, Stable Road filed registration statements that it did not understand contained material misrepresentations. When Kokorich's alleged conduct is viewed in its totality, there is no doubt that he employed an artifice or fraudulent scheme and employed deceptive acts, practices or courses of business. *See SeeThruEquity*, 2019 WL 1998027, at *5.  The Commission has therefore stated a claim under Rules 10b-5(a) and (c) and Sections 17(a)(1) and (3).

### 3.  Kokorich's Arguments Related to the 2019 In-Space Testing of Momentus's Thruster Lack Merit

Kokorich's arguments regarding the in-space testing rely on an incorrect factual recitation and an inapposite legal argument.  First, Kokorich repeatedly asserts that he allegedly stated only that Momentus's thruster successfully fired in space. *See* MTD, p. 16-17. But the Complaint consistently alleges that Kokorich and Momentus claimed that Momentus "successfully tested" its thruster in space.  A test is something that can be passed or failed according to a specified standard, and in this case, the relevant standard was not, "Did the MET fire?" as Kokorich now asserts. *See*

MTD at 10.   Kokorich knew that Momentus had set an internal standard prior to the launch by defining mission success as 100 firings of one minute or longer, which Momentus did not even come close to achieving.   Furthermore, Kokorich knew that he and Momentus had told the public that the mission's purpose was to give "customers, investors and stakeholders . . . absolute confidence that Momentus will deliver their payloads to a given orbit."   Of course, the actual results of the mission could not give that confidence, and in fact the mission was never designed to give that confidence, as Kokorich understood all along. Compl. at ¶¶ 30, 32.

Second, Kokorich argues that he had no "specific duty" to disclose any of the material facts he omitted from his statements. MTD at 13-14, 17-18.   He cites a series of "pure omission" cases in which the defendant was not alleged to have made any statements *at all* but to have engaged in deceptive *conduct* by failing to disclose information he was allegedly required to share.   MTD at 18 (citing, e.g., *Chiarella v. United States*, 445 U.S. 222, 226, (1980) (analyzing "the legal effect of the [defendant's] silence" in an insider trading case); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972) (holding that defendants acted deceptively because they owed a duty of disclosure even to those to whom they made no positive representations)).   Those cases are inapposite.   Kokorich and Momentus made statements on the relevant topics publicly, to Stable Road, PIPE investors, and in the registration statements.   By highlighting pure omissions cases, Kokorich wholly sidesteps the question of whether those statements were misleading by omission under Rule 10b-5(b).   Kokorich has failed to engage with the actual theory of liability explicitly asserted in the Complaint. *See*, *e.g.,* Compl. ¶¶ 58, 85, 89. The Court should reject Kokorich's strawman argument.

c.  **The Commission Has Alleged Primary Violations by Kokorich Related to the Adverse Determinations Against Him on National Security Grounds**

1.  **The Commission Has Sufficiently Pleaded that Kokorich Made Misrepresentations**

Kokorich's statements to Stable Road's CEO regarding his asylum application and the prior CFIUS order against him were false and/or misleading.  Specifically, Kokorich said he was confident his application would be approved and that he had a strong case for political asylum. Under *Omnicare*, those opinion statements were misleading because they did not "fairly align[]" with the facts known to Kokorich at the time. *See Omnicare*, 575 U.S. at 189.  Those facts included:

- The multiple prior adverse determinations against him for national security reasons, including the CFIUS divestiture order and the BIS denial of his export license application;

- Kokorich's failure to persuade CFIUS that he was not a national security threat by making the *precise* argument upon which he had based his asylum application; and

- USCIS's referral notice saying that it had not granted his asylum application because of "inconsistencies" in Kokorich's testimony regarding his political activities in Russia.

Kokorich also assured Stable Road's CEO that the CFIUS divestiture order regarding Astro Digital concerned other investors, not specifically him.  That statement of fact was false. As Kokorich knew or was reckless in not knowing based on CFIUS's communications with his counsel, Kokorich had to divest from Astro Digital because CFIUS had national security concerns about Kokorich specifically. Compl. ¶¶ 38, 67.

By concealing the various national security determinations against him by U.S. government agencies, either through misleading omissions or outright false statements, Kokorich hid a highly material issue from Stable Road's CEO. His false or misleading statements implied that Kokorich's role as Momentus's CEO would not impede Momentus's ability to participate in U.S.

launches and execute its business plan, which at the time included *only* U.S. launches.  That tacit

misrepresentation is actionable, as the Supreme Court recently explained:

> [H]alf-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations. A classic example of an actionable half-truth in contract law is the seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property. See *Junius Constr. Co. v. Cohen,* 257 N.Y. 393, 400, 178 N.E. 672, 674 (1931) (Cardozo, J.). "The enumeration of two streets, described as unopened but projected, was a tacit representation that the land to be conveyed was subject to no others, and certainly subject to no others materially affecting the value of the purchase." *Ibid.*

*Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2000 (2016).  Although *Universal

Health Services* involved misrepresentations under the False Claims Act, the Court explained in a

footnote that the same principle recurs throughout the common law and statutory regimes,

including the antifraud provisions of the securities laws. *Id.* at n.3.

Kokorich's national security issues were the "third road," a looming threat known to one

side of the transaction but not the other that could significantly affect the value of the deal.  By

creating the clear impression that the threat did not exist, Kokorich made actionable

misrepresentations.  For example, *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016), is

instructive on this point. There, the plaintiffs alleged that various statements by the defendant

misled investors about the company's liquidity risk.  The statements were not identical, and some

concerned only factors that contributed to Vivendi's liquidity risk.  The district court entered a

judgment against the corporation, and the Second Circuit affirmed.  The appellate court reasoned

that "the defendant's representations, *taken together and in context*, would have misled a

reasonable investor." *Id.* at 250 (emphasis in original) (quoting *Rombach v. Chang*, 355 F.3d 164,

172 n.7 (2d Cir. 2004) (additional citations omitted)).  As the court explained, "Where a company

seeks fraudulently to hide a particularly large problem with multiple contributing factors, it is quite

probable that the company will have to lie about a number of related topics in order successfully to conceal the larger issue." *Id.*

The same logic applies here.  Kokorich and Momentus sought to hide a particularly large problem and so made misrepresentations about an array of related topics, specifically the prior CFIUS divestiture order, Kokorich's asylum application, and prior denials of Momentus's application for an export control license for Kokorich.  The common theme through all of these misrepresentations was Kokorich's national security problems and the threat they posed to Momentus's viability.

> **2.  The Commission Has Sufficiently Pleaded that Kokorich Employed a Fraudulent Scheme and Engaged in Deceptive Acts, Practices or Courses of Business**

In addition to his own misrepresentations, Kokorich participated in the creation, review and approval of portions of the registration statements that made the same tacit misrepresentation.

First, Momentus asserted in the registration statements that it believed Kokorich's asylum application would be granted.  As analyzed in the previous section, that unqualified statement omitted several material facts that undermined the basis for Momentus's belief.

Additionally, Momentus disclosed that Kokorich had not "yet" obtained an export control license.  Momentus failed to disclose, however, that BIS denied Momentus's first application in 2018 because of national security concerns.  It also did not disclose that, by November 2, 2020, when the first registration statement was filed, Momentus's pending application had been placed on hold and that Momentus had been informed that several agencies, including the Department of Defense, had recommended denying it.  Nor did Momentus disclose that, by December 14, 2020, when the second registration statement was filed, BIS had already communicated its intent to deny the pending application for national security reasons.  Those omissions were materially misleading because they left investors with the impression that Momentus anticipated that Kokorich would

ultimately receive an export control license, when in fact the company had no basis for that expectation given Kokorich's national security problems. *See Omnicare*, 575 U.S. at 188-89.

Finally, both the initial and first amended S-4 registration statements included aggressive revenue projections for Momentus, forecasting that the company would grow from zero revenues in 2019 to revenues of over $4 billion in 2027.  Momentus's misrepresentations about Kokorich's asylum and export license applications contained the tacit misrepresentation that Kokorich did not have national security issues that could jeopardize Momentus's ability to earn revenue from U.S.-based launches and realize those projections.[8]

Over the course of several months, Kokorich used his own statements and those of Momentus to deceive his merger partner and conceal a looming threat to Momentus's business model.  His lies wound their way into Stable Road's registration statements, where they further deceived investors.  The Commission has adequately alleged that the totality of Kokorich's conduct constitutes a deceptive scheme and that Kokorich employed fraudulent acts or practices.

### 3.  Kokorich's Arguments Related to the Adverse Determinations Against Kokorich on National Security Grounds Lack Merit

None of Kokorich's arguments relating to his national security issues withstands any scrutiny. The problems with Kokorich's arguments start with a false framing: Kokorich asserts that the Commission has only alleged misrepresentations related to Kokorich's asylum application. MTD at 19. He is incorrect.  The Commission has also alleged misrepresentations directly related to the prior divestiture order and the prior denial of Kokorich's export license application.

---

[8]  Kokorich misapprehends the significance of the Commission's allegations regarding Momentus's projected revenue. *See* MTD at 21-22, n.14. The Commission does not allege that Kokorich made or even participated in the creation of those projections.  Rather, Kokorich's misrepresentations concealed a significant risk to those projections and thereby misled investors.

Kokorich then justifies his statement to Stable Road's CEO that he was confident his asylum application would be granted by asserting that he, in fact, "had a long history of anti-Putin statements and activities prior to his immigration to the U.S. from Russia." MTD at 19.  That fact is not alleged in the Commission's complaint,[9] cannot be assumed to be true, and should be disregarded for purposes of considering Kokorich's motion. *See RPM*, 282 F. Supp. 3d at 12 (describing the limited facts a court may consider on a motion to dismiss).  In any event, the repeated adverse determinations by U.S. government agencies demonstrate that Kokorich's statements did not fairly align with the facts known to him. *See Omnicare*, 575 U.S. at 189.

Elsewhere in his brief, Kokorich makes a different attempt to justify his confidence in his asylum application by misconstruing the Commission's allegations and making a false deduction. He claims that U.S. government agencies, including the Department of Defense, had to approve Momentus's participation in the El Camino Real mission, and their approval allegedly gave him comfort that Momentus could execute its business plan. MTD at 6-7.  But the Complaint alleges that U.S. government agencies have to approve Momentus's participation in *U.S.-based* launches. Compl. at ⁋ 63.  The El Camino Real mission launched from Kazakhstan. Armstrong Decl., Exh.4, p. 5.  Furthermore, while Astro Digital did apply for and receive a license from the FCC related to the mission, the application does not disclose Momentus, Inc.'s participation in the launch (or even that any third party was participating in the launch). *See generally,* FCC application, available at https://fcc.report/ELS/Astro-Digital-US-Inc/0698-EX-CN-2018.  The Court should not infer from the Commission's allegations that the FCC had the authority to block Momentus's participation in

---

[9] The Complaint alleges that Kokorich represented to CFIUS that he had a long history of criticizing the Russian government, not that his representation was true. Compl., ⁋ 38.

a foreign launch or that it was even aware in 2019 that Momentus was participating in the El Camino Real mission.[10] The Court should disregard this argument.

Kokorich also claims that the Department of Defense "announced" for the first time that Kokorich might be a national security risk in January of 2021. Regardless of whether the Department of Defense had ever before made a formal "announcement" of its position, the Department of Defense has representatives at CFIUS and BIS, and Kokorich and Momentus were aware of the prior adverse determinations against Kokorich by those agencies for national security reasons starting in 2018.

Kokorich then argues that he did not need to disclose any risks related to his asylum application because "the risks surrounding any particular asylum application are well known." MTD at 19.   But the particular weakness of Kokorich's asylum application, arising out of Kokorich's specific circumstances and history, were not known to either Stable Road's CEO or investors generally—and indeed, Kokorich's misleading assurances sought to downplay whatever risks those audiences considered attendant to a generic asylum application.  This argument fails.

Finally, Kokorich argues that he had no specific duty to disclose the prior CFIUS order or the denial of his export control license. MTD at 20.  As before, Kokorich relies on "pure omissions" cases, which are simply inapplicable to the allegations in the Complaint.  Kokorich or Momentus made affirmative statements about the CFIUS order and the BIS denial while omitting other facts that made those statements misleading.

---

[10] By contrast, an investor in 2020 who wanted to learn more about Momentus's 2019 in-space testing could have found the publicly available license application for the allegedly "successful" El Camino Real mission, which plainly described the mission referred to in the registration statements, and gained a false understanding of Momentus's and Kokorich's claims.

### d.  The Commission Has Stated a Claim Against Kokorich for Aiding and Abetting Momentus's Primary Violations

To state a claim for aiding and abetting, the Commission must allege: 1) a primary violation; 2) Kokorich's substantial assistance; and 3) scienter. *Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000).  Momentus made knowing or reckless misrepresentations in the registration statements.  Momentus drafted the relevant portions of the registration statements and provided them to Stable Road for inclusion in the filings.  These portions use "we" and "our" to refer to Momentus, so when the registration statements says, "[W]e have successfully tested our water plasma propulsion technology in space," that is a statement by Momentus.  Momentus was therefore the "maker" of the misrepresentations in the registration statements. *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142–43 (2011) ("[A]ttribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.").

Kokorich provided substantial assistance to Momentus's primary violation.  He helped draft the statements, he edited and reviewed them, and he ultimately approved them for submission to Stable Road.  That conduct is plainly substantial assistance. *SEC v. Brown*, 740 F. Supp. 2d 148, 168 (D.D.C. 2010) (*SEC v. Brown*, 740 F. Supp. 2d 148, 168 (D.D.C. 2010) (allegations that CFO prepared, reviewed and approved proxy statements were adequate to allege substantial assistance of company's primary violation based on misstatements therein).

Kokorich's arguments to the contrary largely rehash his arguments that there were no material misrepresentations in the registration statements and therefore no primary violation.  That argument fails for the same reasons stated above.  He also asserts, without any support argument, that the complaint does not allege facts that would constitute substantial assistance.  That argument also fails. The Commission alleged Kokorich's substantial assistance with particularity.

34

## CONCLUSION

For the foregoing reasons, the Court should deny Kokorich's Motion to Dismiss the Complaint.  However, to the extent the Court concludes that the Commission has failed to plead any of the facts articulated herein with sufficient particularity, the Commission requests leave to amend the Complaint to cure that deficiency.


Dated: October 25, 2021                     Respectfully submitted,


                                            /s/ Melissa Armstrong
                                            Melissa Armstrong
                                               Tel: 202.551.4724
                                               Email: armstrongme@sec.gov
                                            Fernando Campoamor-Sánchez (DC Bar No. 451210)
                                               Tel: 202.551.8523
                                               Email: campoamorsanchezf@sec.gov

                                            Securities and Exchange Commission
                                            100 F Street, N.E.
                                            Washington, D.C. 20549
                                            **_Counsel for Plaintiff_**

## **CERTIFICATE OF SERVICE**

I certify that on October 25, 2021, I served PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT MIKHAIL KOKORICH'S MOTION TO DISMISS THE COMPLAINT via CM/ECF upon counsel for Defendant Mikhail Kokorich.


 /s/ Melissa Armstrong
Melissa Armstrong