## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **SECURITIES AND EXCHANGE COMMISSION,** |
| *Plaintiff*, |
| **v.** |
| **MIKHAIL KOKORICH,** |
| *Defendant*. |

**Civil Action No. 21-1869 (ACR)**

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Securities and Exchange Commission ("SEC") brings this action against Defendant Mikhail Kokorich under the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ("Securities Act"), and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ("Exchange Act").  It concerns an alleged fraud committed by Defendant, a Russian citizen and the co-founder and former Chief Executive Officer of a privately-owned space industry startup, Momentus, Inc. ("Momentus").  *See* Dkt. 1 ¶¶ 1–2.  The SEC alleges in its Complaint that Defendant made misrepresentations, false statements, and material omissions regarding: (1) the success, or, rather, lack thereof, of Momentus's single in-space test of its key technology; and (2) several adverse national security determinations against Defendant, which impaired Momentus's ability to participate in U.S.-based rocket launches.  Defendant has moved to dismiss, contending

primarily that each challenged statement was true and that it was not false by omission because he had no duty to disclose additional information.  *See* Dkt. 8-1 at 1.[1]

For the reasons set forth below, the Court denies the motion to dismiss.

## BACKGROUND

Founded in 2017, Momentus is a space infrastructure company that hopes to provide, among other things, satellite-positioning services.  *See* Dkt. 1 ¶ 16.[2]   The SEC alleges that Defendant committed fraud to secure and promote a merger agreement between Momentus and Stable Road Acquisition Corp. ("Stable Road"),[3] which, if successful, would effectively have taken Momentus public and infused it with nearly $350 million in investor funds.  *See id.* ¶ 1. Defendant stood to benefit from Momentus's success, even more so if Momentus merged with

---

[1]     Defendant has requested oral argument on the pending motion.  Given the sufficiency of the parties' written submissions to resolve the pending motion, the Court denies this request.  *See* LCvR 7(f) (stating that allowance of oral hearing is "within the discretion of the Court").

[2]     The reader interested in satellite technology may already know that applying Albert Einstein's theories of special and general relativity plays an important role in the Global Positioning System ("GPS").  Perhaps less well known, but equally important to that technology, are the scientific contributions of Dr. Gladys West, the second African-American woman hired (in 1956) at the Naval Proving Ground in Virginia.  Dr. West "programmed the computer that calculated Earth's geoid to sufficient precisions to enable the existence of GPS.  [That was] no small feat; to accomplish this, [she had] to account for variations in all the forces and effects that can distort the shape of the Earth."  Ethan Siegel, "GPS Only Exists Because of Two People: Albert Einstein and Gladys West," *Forbes* (Feb. 18, 2021), *available at* https://www.forbes.com/sites/startswithabang/2021/02/18/gps-only-exists-because-of-two-people-albert-einstein-and-gladys-west/?sh=6901af125864.  For this, and numerous other accomplishments, Dr. West was inducted into the Air Force Space and Missile Pioneers Hall of Fame in 2018.  *See id.*

[3]     Stable Road is a publicly traded special-purpose acquisition company ("SPAC").  Dkt. 1 ¶ 1.

Stable Road.  *Id.* ¶¶ 21, 47.  For its part, Momentus acknowledged publicly that it was "highly dependent" on Defendant, who was a driver to the company's success.  *Id.* ¶ 66.

## I.      Momentus's Water Plasma Technology

During times relevant to this action, Momentus touted its "cornerstone" technology: a propulsion system using microwave electro-thermal ("MET") water plasma thrusters.  *Id.* ¶ 18. Large commercial satellite launch providers offer launch services to satellite owners, but with a significant limitation.  *Id.*  They can drop off the satellites only in a limited range of orbits.  *Id.* Momentus hoped to provide a more robust delivery system, one which would put the satellite into a custom orbit.  *Id.*  Its public business plans and revenue projections were premised on starting U.S.-based launches using MET thruster technology in December 2020.  *Id.* ¶ 8.  The catch, however, was that no such technology had ever been used in space commercially.  *Id.* ¶ 20.  Indeed, by early 2019, Momentus lacked any in-space flight experience with the MET thruster.  *Id.* ¶ 21.

Momentus planned a mission for 2019, code-named "El Camino Real,"[4] to test its MET water propulsion thruster technology in space, help market the company, and attract investors. *Id.* ¶¶ 21–22.  In a public filing dated September 12, 2018, Momentus told the Federal Communications Commission ("FCC") that the El Camino Real mission would be "a

---

[4]      Defendant states that Momentus named the test flight "El Camino Real after a legendary Spanish medieval road that took about 200 years to build, beginning in the early 1600s."  Dkt. 8-1 at 6.  More specifically, the Camino Real de Tierra Adentro "was the Royal Inland Road, also known as the Silver Route" and consists of a 2,600-kilometer route "that extends north from Mexico City to Texas and New Mexico."  It was used primarily as a trade route from the mid-16th to the 19th centuries.  *See* "Camino Real de Tierra Adentro," *Unesco World Heritage Convention*, *available at* https://whc.unesco.org/en/list/1351/.

commercial demonstration" of Momentus's propulsion system that would show its "reliability, longevity, performance, and utility." *Id.* ¶ 24.  In a January 2019 blog post on its website, Momentus stated that the mission would give investors "absolute confidence" that its service would be "on time, safe and reliable." *Id.* ¶ 23.[5]  The blog post added that Momentus would "be able to run the thruster long enough to fully characterize its performance in space with dozens of stop start cycles and to then safely de-orbit the vehicle." *Id.* (alterations omitted).

By this criterion, the El Camino Real mission was unsuccessful.  Defendant was copied on emails in November 2019 between Momentus's Chief Technology Officer and its Chief Engineer discussing creation of a "failure review board" to study the El Camino Real mission, due to the company's inability to obtain useful data from the mission. *Id.* ¶ 30.[6]  In addition, a Momentus engineer observed in a document sent to Defendant in February 2020 that Momentus did not obtain "any useful mission results" from the launch. *Id.*  And according to a former Momentus officer, the mission yielded "no data to suggest that that thruster would deliver an impulse of any commercial significance." *Id.* ¶ 29.  Worse still, Momentus acknowledged internally that the mission could not have established the thruster's commercial viability, even if

---

[5]     In his reply brief, Defendant states that (1) "[t]hree days before the blog post was published, [the Bureau of Industry and Security ("BIS")] issued an export license for the test flight to Astro Digital, the firm that provided the launch vehicle," and (2) the FCC "issued a permit the next month"—and the Court may take judicial notice of the BIS license and FCC permit, even though they "are not mentioned in the Complaint," because they are official U.S. government documents.  Dkt. at 14 & n.9.  Even if the Court were to take judicial notice of these documents, their contents would not defeat the sufficiency of the SEC's claims.

[6]     Defendant argues that "[t]he Complaint also incorrectly reads the email as suggesting that the proposal for a 'failure review board' covered the water propulsion MET system."  Dkt. 8-1 at 8.  Because this interpretation is disputed, the Court does not address it on a motion to dismiss.

it had met the internal criterion for success. *Id.* ¶ 25. That was so because the thruster was "too small, too inefficient, too low in specific impulse, too low in total impulse." *Id.* ¶ 25 (alterations omitted).

The mission also did not meet internal criterion for success. In an internal presentation, Momentus defined "mission success" as including "100 individual burns of 1 minute of more." *Id.* ¶ 22.[7] Yet, Momentus attempted only 23 firings and only three hot firings produced plasma. *Id.* ¶ 26. No firing lasted a full minute or generated measurable thrust. *Id.* Momentus lost contact with the satellite approximately three months into the planned six-month mission. *Id.* It was therefore never able to attempt the remaining 77 firings it had planned, much less achieve any of the "100 individual burns of 1 minute or more." *Id.*

Even though Defendant knew that the El Camino Real mission did not demonstrate commercial viability or meet internal criterion for success, he told the industry periodical *Space News* the opposite. The outlet's September 25, 2019, article, titled "Momentus reports success in testing water plasma propulsion," quoted Defendant as stating, "Water plasma propulsion is now technologically mature enough to be baselined for operational in-space transportation missions." *Id.* ¶ 31. In other words, it could be used commercially. *Id.* Defendant also repeated the claim from Momentus's January 2019 blog post that "the purpose of the El Camino Real mission was to flight demonstrate our core propulsion technology so customers, investors and stakeholders can have absolute confidence that Momentus will deliver their payloads to a given orbit." *Id.*

---

[7]     A "burn" refers to operating the thruster and producing thrust for a period. *See* Dkt. 1 ¶ 22.

## II.      Momentus's Need to Raise Funds

By late 2019, Momentus was facing financial difficulties.  It had no revenue and needed additional capital to fund its growth.  *Id.* ¶ 44.  In mid-2020, the company therefore engaged an investment bank to help it find a suitable SPAC candidate for a merger.  *Id.*  Two SPACs declined to move forward, but Stable Road was interested.  *Id.* ¶ 45.

In June 2020—after the El Camino Real mission had concluded—Defendant and the CEO of Stable Road began to discuss a possible merger.  *Id.* ¶ 46.  Over the next several months, Defendant participated in merger negotiations with Stable Road and made presentations to Private Investment in Public Equity ("PIPE") investors, who committed to purchase shares of the post-merger company if shareholders approved the transaction.  *Id.* ¶¶ 6–7, 46, 51.  Momentus and Stable Road announced their merger on October 7, 2020, subject to shareholder approval.  *Id.* ¶ 7.

During merger discussions, Defendant told Stable Road's CEO that the El Camino Real mission had been a success and that it was a great achievement for Momentus to have fired the thruster and tested its propulsion technology in space.  *Id.* ¶ 48.  He did not, however, inform the CEO of any of the failures or problems with the mission.  *Id.* ¶ 49.  In presentations to PIPE investors, institutional investors, and analysts, Defendant continued to assert that the testing had been successful.  *Id.* ¶ 51–52.  A portion of the slides prepared by Defendant and Momentus, presented to investors and analysts, and publicly filed with the SEC on a Form 8-K, claimed that Momentus "successfully tested water-based propulsion technology on a demo flight launched

mid-2019 – [and it] is still operational today." *Id.*  In scripted comments, Defendant publicly

stated that Momentus had "successfully tested [its] groundbreaking thruster in space." *Id.* ¶ 52.

The claimed "success" of the El Camino Real mission continued in S-4 registration

statements.[8]  Stable Road filed a S-4 registration statement regarding the merger in November

2020 and an amended one in December 2020. *Id.* ¶¶ 53–54.  The S-4 registration statements

each contained a subsection titled, "Information about Momentus," that Momentus drafted with

Defendant's input, review, and approval. *Id.* ¶ 54–55.  In this subsection of each registration

statement, Momentus stated that it "successfully tested our water plasma propulsion technology

in space." *Id.*[9]

### III.    Defendant's Immigration and National Security Issues

During this same period, Defendant became aware that various federal agencies

determined that he posed a national security risk.  This assessment created a heightened risk to

Defendant's immigration status.  It also put Momentus in a quandary.  Momentus likely could

not secure necessary licenses while Defendant remained at the helm; on the other hand,

---

[8]      A registration statement is a filing with the SEC making required disclosures in
connection with the registration of a security, a securities offering, or an investment company
under federal securities laws.  Dkt. 1 ¶ 53.

[9]      The SEC also alleges that a June 2021 amended registration statement filed by Stable
Road and Momentus "corrected these false statements and misleading omissions by describing
the actual results of the El Camino Real mission."  Dkt. 1 ¶ 60.  Defendant argues this allegation
should be stricken because it discusses "remedial efforts."  *See* Dkt. 8-1 at 21 n.14.  The SEC
counters that Defendant did not take remedial measures and, in any event, evidence related to an
issuer's corrective disclosures are admissible in securities fraud cases.  *See* Dkt. 11 at 10 n.4.  It
is not necessary to resolve this dispute presently, as the Court has not considered the allegation in
its analysis of this motion.

Momentus was "highly dependent on Mikhail Kokorich, its co-founder and chief executive officer.  Mr. Kokorich invented the majority of Momentus's inventions and remain[ed] deeply involved in Momentus's business."  *Id.* ¶ 66 (quoting Momentus's November 2020 and December 2020 S-4 registration statements).  Defendant himself highlights that the November 2020 S-4 described him as "a talented physicist and businessman who became the driving force behind Momentus."  Dkt. 8-1 at 4.

Defendant's status was therefore an important issue.  Defendant had been living in the United States on a work visa.  In or around June 2018, however, U.S. Customs and Immigration Services ("USCIS") revoked Defendant's work visa and denied his application for permanent resident status.  Dkt. 1 ¶ 40.  To stay in the United States, Defendant subsequently applied for asylum.  *Id.* ¶¶ 5, 40.  The application was not well-received.  In August 2019, USCIS informed Defendant that it had not granted his asylum application but instead referred his case to an immigration judge for adjudication in removal proceedings, citing "inconsistencies" in Defendant's application and testimony "with regard to his political affiliations and activities in Russia."  *Id.* ¶ 41 (alterations omitted).

Later, and notwithstanding these adverse determinations, Defendant told Stable Road's CEO that he was confident his asylum application would be approved.  *Id.* ¶ 66.  In Momentus's contributions to Stable Road's initial and amended S-4 registration statements, which Defendant reviewed and approved, the company stated that it believed Defendant's asylum application would be granted.  *Id.* ¶ 79.  However, in neither situation did Defendant or Momentus disclose

that USCIS had earlier raised specific concerns with the application and refused to grant it.  *Id.*
¶¶ 67–68, 79.

Momentus also began to feel the effects of Defendant's status as a national security
concern.  In 2017, Momentus applied for an export control license for Defendant, which would
have allowed him to access export-controlled technology.  *Id.* ¶ 35.  It fared even worse than the
asylum application.  In March 2018, the BIS, a bureau of the Department of Commerce, after
consulting with the Departments of Defense and State, rejected this application outright.  *Id.*
¶¶ 34–35.  The BIS found that Defendant was not an "acceptable recipient" of the technology
"for national security reasons."  *Id.* ¶ 35.[10]  Momentus applied again for an export control license
for Defendant in February 2020.  *Id.* ¶ 69.  In April 2020, Momentus learned its application had
been placed on hold by the BIS reviewer.  *Id.*  On October 23, 2020, before the filing of the
initial S-4 registration statement, Momentus learned that the BIS's Operating Committee had
decided to deny the license, with the possibility of internal appeal.  *Id.* ¶¶ 66, 69.  Then, on
November 9, 2020, before the filing of the amended S-4 registration statement, the BIS formally
notified Momentus by letter of its intent to deny the license without internal appeal.  *Id.* ¶ 70.

Defendant did not share the extent of these national security issues during his merger
communications with Stable Road.  *Id.* ¶ 68.  And, despite these determinations, in the "Risk
Factors" subsection of Momentus's contributions to the initial and amended S-4 registration

---

[10]     Separately, in June 2018, Committee on Foreign Investment in the United States
("CFIUS") representatives told Defendant's attorneys that his full divestiture from a different
space technology company was necessary to mitigate national security concerns.  *See* Dkt. 1
¶¶ 36–39.

statements, which Defendant reviewed and approved, the company disclosed that Defendant had not "yet" obtained an export control license.  *Id.* ¶ 80.  The statement did not disclose that the BIS had denied Defendant's first application in 2018 because of national security issues; that at the time of the initial S-4 statement, the BIS had placed the 2020 application on hold; or that at the time of the amended S-4 statement, the BIS had formally communicated its intent to deny the 2020 application for national security reasons.  *Id.*

By letter dated January 21, 2021, the Department of Defense informed Momentus that it posed a risk to national security due to Defendant's ownership and control of the company.  *Id.* ¶ 73.  Four days later, Defendant stepped down as the company's CEO and placed his shares of its stock into a voting trust.  *Id.*  Later that year, Momentus and Defendant entered into a National Security Agreement with CFIUS by which, among other actions to be taken by Momentus, Defendant agreed to fully divest from the company.  *Id.* ¶ 77.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Wood v. Moss*, 572 U.S. 744, 757–58 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability," and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).

"Under Federal Rule of Civil Procedure 9(b), which applies in cases of fraud, a plaintiff 'must state with particularity the circumstances constituting fraud,' though scienter may still be pled generally.'" *U.S. Sec. & Exch. Comm'n v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69, 82 (D.D.C. 2014) (quoting Fed. R. Civ. P. 9(b)); *see also Sec. & Exch. Comm'n v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 12–13 (D.D.C. 2017).  This heightened pleading standard is designed to "discourage the initiation of suits brought solely for their nuisance value, and safeguard[] potential defendants from frivolous accusations of moral turpitude," as well as "guarantee all defendants sufficient information to allow for preparation of a response." *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (cleaned up).  "In addition, because fraud encompasses a wide variety of activities, the complaint must be particular enough to guarantee all defendants sufficient information to allow for preparation of a response." *U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015) (cleaned up).

In considering a motion to dismiss for failure to plead a claim on which relief can be granted, the court must consider the complaint in its entirety, accepting all factual allegations in the complaint as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555; *see also Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015).  Courts may "ordinarily examine" other sources "when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## DISCUSSION

### I.     Securities Fraud (Counts I and II)

The SEC claims that Defendant committed primary violations of Section 10(b) of the

Exchange Act, codified at 15 U.S.C. § 78j(b); and Section 17(a) of the Securities Act, codified at

15 U.S.C. § 77q(a).  *See* Dkt. 1 ¶¶ 87, 91.  His alleged violations involve participating in the

creation or delivery of false or misleading statements in merger discussions with Stable Road's

CEO; presentations to PIPE investors, institutional investors, and analysts; a Form 8-K publicly

filed with the SEC; an interview with the industry media outlet *Space News*; and initial and

amended S-4 registration statements publicly filed with the SEC.  *See, e.g.*, *id.* ¶¶ 31–32, 52, 85,

89.  These statements related to Momentus's El Camino Real mission and to Defendant's

immigration and national security issues.  *Id.* ¶¶ 85, 89.  In his motion to dismiss, Defendant

argues that his statements were true and that they were not false by omission because he had no

duty to provide further information.  *See* Dkt. 8-1 at 1.

Section 10(b) of the Exchange Act prohibits securities fraud:

> It shall be unlawful for any person, directly or indirectly, by the use of
> any means or instrumentality of interstate commerce or of the mails, or
> of any facility of any national securities exchange . . . [t]o use or
> employ, in connection with the purchase or sale of any security
> registered on a national securities exchange or any security not so
> registered, or any securities-based swap agreement[,] any manipulative
> or deceptive device or contrivance in contravention of such rules and
> regulations as the Commission may prescribe as necessary or
> appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  The primary rule that the SEC has prescribed to implement Section 10(b) is

Rule 10b-5:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> >
> > (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  As many courts have noted, "Rule 10b-5 encompasses only conduct already prohibited by § 10(b)."  *SEC v. Familant*, 910 F. Supp. 2d 83, 91 (D.D.C. 2012) (quoting *Stoneridge Inv. Partners v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Section 17(a) of the Securities Act also prohibits securities fraud:

> It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly[:] (1) to employ any device, scheme, or artifice to defraud[;] or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

"Sections 17(a)(1) and 10(b) and Rule 10b–5 essentially have the same elements."  *SEC v. Milan Grp., Inc.*, 962 F. Supp. 2d 182, 191 (D.D.C. 2013), *aff'd in part, vacated in part on other grounds*, 595 F. App'x 2 (D.C. Cir. 2015); *see also SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).  The SEC must show that a defendant "'(1) made a material

misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent

device; (2) with scienter; (3) in connection with the purchase or sale of securities.'" *SEC v.*

*Familant*, 910 F. Supp. 2d 83, 92 (D.D.C. 2012) (quoting *Monarch Funding Corp.*, 192 F.3d 295

at 308).[11]  "Sections 17(a)(2) and (a)(3) require [the] SEC to show essentially the same elements,

with one exception: they do not require a showing of scienter."  *Milan Grp.*, 962 F. Supp. 2d at

191.  "Instead, proof of negligence is sufficient to establish a violation of these provisions."  *Id.*

(cleaned up and quotations omitted).

    A.    <u>Material Misrepresentations or Omissions</u>

"An actionable misstatement or omission . . . must be both false or misleading and

material."  *Plymouth Cnty. Ret. Ass'n v. Advisory Bd. Co.*, 370 F. Supp. 3d 60, 75–76 (D.D.C.

2019) (emphasis omitted).  "A statement or omission is misleading if a reasonable investor,

reading the statement fairly and in context, would be misled."  *Id.* at 76.  "In addition, the

statement or omission must have been misleading at the time it was made; liability cannot be

imposed on the basis of subsequent events."  *Id.* (quotations omitted).

"An omitted fact is material if there is a substantial likelihood that a reasonable

shareholder would consider it important."  *SEC v. Steadman*, 967 F.2d 636, 643 (D.C. Cir. 1992)

(quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (alterations omitted).  For an

---

[11]    Defendant does not challenge the second and third elements, other than a brief discussion
in his reply brief.  *See* Dkt. 13 at 2–4.  Although issues raised for the first time on reply are
typically deemed waived, *see Novak v. Cap. Mgmt. & Dev. Corp.*, 570 F.3d 305, 316 n.5 (D.C.
Cir. 2009); *Latson v. Holder*, 82 F. Supp. 3d 377, 388 n.4 (D.D.C. 2015) (listing cases), the
Court addresses these elements for the sake of completeness.

omitted fact to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quotations omitted).  The court must look to "the context in which [the statement] was made, according to the allegations in the complaint" to determine how a reasonable investor would have "plausibly understood" it.  *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 109 (D.C. Cir. 2015).[12]

"[S]tatements of reasons, opinions, or beliefs regarding material facts can be actionable, even if these statements contain conclusory terms like 'high,' 'value,' and 'fair' because these terms, when used in a commercial context, are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Howard v. Liquidity Servs., Inc.*, 177 F. Supp. 3d 289, 304 (D.D.C. 2016) (quoting and citing *In re Harman*, 791 F.3d at 108–09) (cleaned up).  In contrast, "statements that are too general to cause a reasonable investor to rely upon them are immaterial and inactionable." *In re Harman*, 791 F.3d at 109 (cleaned up and quotations omitted).

---

[12]     Although *In re Harman* did not involve an action brought by the SEC, the court's discussion of the materiality standard there, as in other private litigation cases, applies to this SEC enforcement action.  *See U.S. Sec. & Exch. Comm'n v. Nielson*, 2020 WL 9439395, at *15 (D.D.C. Feb. 13, 2020), *report and recommendation adopted*, 2020 WL 9439363 (D.D.C. July 30, 2020) (citing *In re Harman* for materiality standard); *see also RPM Int'l, Inc.*, 282 F. Supp. 3d at 23 (citing cases brought by private plaintiffs for materiality standard in SEC enforcement action).

After carefully reviewing Defendant's statements, and viewing them together with the information the SEC alleges that Defendant knew and did not disclose, "[i]t is impossible to say" that they "are so palpably unimportant that they are immaterial as a matter of law; whether, in the end, they are material is a question of fact not properly resolved on a motion to dismiss." *In re Newbridge Networks Sec. Litig.*, 767 F. Supp. 275, 279 (D.D.C. 1991); *see also In Re Stable Rd. Acquisition Corp.*, 2022 WL 2762213, at *8 (C.D. Cal. July 13, 2022).[13]

        i.     *Momentus's 2019 El Camino Real Mission*

The SEC alleges that Defendant's claims that Momentus "successfully tested" its MET water propulsion thruster technology in the 2019 El Camino Real mission were false or misleading because the mission's results failed to meet Momentus's internal goals and did not align with Momentus's public statements about the mission. *See* Dkt. 1 ¶¶ 51–52, 55, 57, 59, 62. The Court cannot conclude as a matter of law that these statements and omissions were immaterial.[14]

---

[13]    In a related class action, a district court denied in part a motion to dismiss a complaint that included similar allegations related to Momentus's technology and Defendant's national security issues. *See In Re Stable Rd.*, 2022 WL 2762213, at *4–6, *8–11. To the extent those allegations overlap with the SEC's allegations here, the Court finds the reasoning of *In Re Stable Road* persuasive. Specifically, for the reasons explained below, although the Court "has not discussed every alleged statement or omission in detail, the Court is unable to conclude as a matter of law at the pleading stage that any of the alleged statements or omissions were not material or misleading." *Id.* at 9 n.13.

[14]    Throughout the Complaint, the SEC refers to alleged "misrepresentations of material fact and misleading omissions." *See* Dkt. 1 at 13, 17 (capitalization altered). The Court construes the allegations and Defendant's argument as the parties do—either misrepresentations and/or misrepresentations by omission.

Defendant contends that his "statements regarding the *successful* firing of the new MET propulsion system are, in and of themselves, correct – it fired in space for the first time." Dkt. 8 at 16 (emphasis added); *see also id.* at 7 (citing Dkt. 1 ¶ 22). It may well have fired in space for the first time. However, as any loyal Red Sox fan knows all too well, the fact that a team scores a run in the first inning says nothing about whether it ultimately wins the game. The question is not what the mission accomplished initially, it is whether the Defendant's public statements and omissions materially misrepresented the ultimate outcome. Here, the Complaint alleges that the system firing in space for the first time failed to meet both the public and internal goals that Momentus set for the mission. *See* Dkt. 1 ¶¶ 26–30. In other words, the mission was not successful. Yet, Defendant stated publicly, more than once, that the mission had been a success. *See, e.g.*, *id.* ¶¶ 31–32.

Defendant's argument that he had no duty to provide more information about the mission's success, *see* Dkt. 8-1 at 16, is also unavailing. Rule 10b-5 and Section 17(a) both establish that a defendant has a duty to speak if he made statements that, without more information, would be misleading to investors, because both forbid the omission "to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . ." 170 C.F.R. § 240.10b-5(b); 15 U.S.C. § 77q(a)(2).

Here, Defendant spoke. And when he spoke, he had a duty to speak further under Rule 10b-5 and Section 17(a) because his statements, "in the light of the circumstances under which they were made," made the disclosure of "a material fact necessary in order to make the

statements made . . . not misleading."  170 C.F.R. § 240.10b-5(b); 15 U.S.C. § 77q(a)(2).[15]

Thus, even crediting Defendant's argument that he correctly identified one successful aspect of

the mission, he failed to provide necessary context for a reasonable investor to understand the

limited nature of that success.

    The Court further rejects Defendant's argument that the Complaint does not cite a

consistent "metric[] . . . designed as a kind of scorecard for the test flight."  Dkt. 8-1 at 9.  A

statement does not need to "contain its own metric" to be actionable.  *In re Harman*, 791 F.3d at

110.  That said, here the Complaint cited two different scorecards—Defendant's publicly-stated

"commercial viability" metric and the company's own internal criterion.  Dkt. 1 at ¶¶ 23, 29.

Momentus met neither.[16]

---

[15]    Defendant's citations to *Chiarella v. United States*, 445 U.S. 222, 228 (1980), and to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152–53 (1972), for the proposition that "[o]ne must possess an affirmative duty to disclose omitted facts," *see* Dkt. 8-1 at 13–14, are inapposite.  Those cases did not involve affirmative statements made without sufficient context, but silence and allegedly deceptive conduct.  *See Chiarella*, 445 U.S. at 226 (explaining that the "case concerns the legal effect of the [defendant's] silence"); *Affiliated Ute Citizens*, 406 U.S. at 153 (explaining that the case "involve[es] primarily a failure to disclose").

[16]    Defendant also argues that two of his statements should receive protection under the bespeaks-caution doctrine, *see* Dkt. 15 at 2, but that doctrine—which "applies only to statements that are forward-looking," *e-Smart Techs., Inc.*, 31 F. Supp. 3d at 84 (quotations omitted)—is inapposite.  Even if the doctrine applies to SEC enforcement actions, a question the Court need not address here, the two statements about Momentus cited by Defendant are not forward-looking.  One statement—that "the El Camino Real mission *had been* a success,"—refers to a past event.  Dkt. 1 ¶ 48 (emphasis added).  The other statement cited by Defendant—that "[w]ater plasma propulsion *is now* technologically mature enough to be baselined for operational in-space transportation missions"—refers to the present.  *Id.* ¶ 31 (emphasis added).

    ii.  *Defendant's Immigration and National Security Issues*

  The SEC alleges that Defendant's claims that he had not "yet" obtained an export control license[17] and that he believed his asylum application would be granted could plausibly be false or misleading because he did not disclose information about his immigration and national security issues that significantly undermined those beliefs.  *Id.* ¶¶ 79–80.

  In response, Defendant argues primarily that "the January 13, 2021 DoD letter was a game changer," Dkt. 8-1 at 2, because until then, he was not aware of the government's national security concerns.  This argument does not comport with the Complaint's alleged timeline, which the Court must construe as true at this time.  The game was already well afoot by January 13, 2021, with numerous notifications to Defendant of the government's national security concerns.  In March 2018, when BIS denied the application for an export control license, it cited "national security reasons" in the rejection notice sent to Momentus.  Dkt. 1 ¶ 35.  In June 2018, CFIUS informed Defendant's counsel "that a full divestiture of Kokorich's participation in [a different] space technology company was necessary to mitigate the national security concerns."  *Id.* ¶ 37; *see id.* at ¶ 36.   Defendant's attorneys responded in a letter two days later, copying Defendant, and stated "they understood that CFIUS had deemed [him] a national security risk."  *Id.* ¶ 38; *see also id.* at ¶ 39.  Further, drawing reasonable inferences in favor of the SEC, USCIS's communications with Defendant in June 2018 (revoking his work visa and denying his

---

17  An export control license would let Defendant access Momentus's export-controlled technology.  Dkt. 1 ¶ 35.  If Momentus or its launch partners could not obtain the necessary licenses, Momentus may have been unable to execute its business plan, conduct additional test missions, or ultimately offer commercial satellite placement services.  *Id.* ¶ 64.

application for permanent resident status) and August 2019 (not granting his asylum application and referring his case to an immigration judge), *id.* ¶¶ 40–41, provided him with additional notice of his national security risk.[18]  Therefore, the Court cannot accept Defendant's argument that January 13, 2021, was somehow a watershed moment that drastically changed his understanding of the government's assessment of his security risk.

Defendant's more specific contentions fare no better.  Momentus's public statements that Defendant had not "yet" obtained an export control license implied to investors that there was reason to believe Defendant could obtain an export control license in the future.  The denial of his 2017 application and impending denial of his 2020 application undermine any rationale for such optimism, as do his failure to receive asylum from USCIS and forced divestiture from a prior space technology company.  *See id.* ¶¶ 35, 37–38, 41, 69–70.  Yet, Defendant did not disclose any of these developments.  Again, the Court cannot conclude as a matter of law that a reasonable investor would have considered these adverse determinations to be immaterial.

Momentus's statements that it was "highly dependent" on Defendant, *id.* ¶ 66, provide further support for the Court's conclusion.  A reasonable investor perhaps may not consider the immigration status or national security standing of every company employee to be material.  But it is a plausible allegation that a reasonable investor would consider those issues to be material concerning the company's co-founder and CEO, particularly in light of Momentus highlighting

---

[18]   This inference is reasonable, in part, because on or around the same date Defendant was referred to removal proceedings, "multiple government agencies, including the FBI, the U.S. Department of Homeland Security, and the BIS's Office of Export Enforcement, arrived unannounced at Momentus's headquarters" to question employees "about possible export control violations by Kokorich as well as improper technology transfers."  Dkt. 1 ¶ 42.

his importance.  Because Defendant reviewed and approved the pertinent statements,[19] the SEC

states a plausible claim that he is liable for these misrepresentations or misleading omissions of

material fact.

As to the asylum claim, Defendant counters that USCIS's decision to not grant him

asylum was immaterial because an immigration judge would be legally obligated to make a *de*

*novo* determination.  *See* Dkt. 8-1 at 20.[20]  This argument is not persuasive.  While the

immigration judge would make a *de novo* determination, the underlying facts would remain

largely, if not entirely, the same.  Based on its review of the evidence, USCIS had revoked

Defendant's work visa, denied his application for permanent resident status, and declined to

grant him asylum.  Dkt. 1 ¶¶ 5, 40–41.  And numerous federal agencies had raised national

security concerns about Defendant.  *Id.* ¶ 79.  Defendant provides no basis to conclude that an

immigration judge would have access to different evidence or would review the available

evidence any differently than had USCIS and numerous other federal agencies regarding

---

[19]     Defendant highlights that the S-4 filings were reviewed by, among others, "a cadre of attorneys."  Dkt. 8-1 at 9.  He provides no support for this assertion.  In any event, the Court cannot consider that alleged fact—which is found nowhere in the Complaint—at this time.

[20]     Defendant argues that his statements regarding his asylum application "look to the future" and "should at least be given deference under the bespeaks-caution doctrine."  Dkt. 15 at 3.  Even if the doctrine applied here, Defendant does not argue that he used cautionary language to limit the scope of his asylum statements.

Defendant's national security status.  The Court cannot conclude as a matter of law that a reasonable investor would have considered these adverse determinations to be immaterial.[21]

Therefore, as with his statements about the El Camino Real mission's test results, Defendant's statements through himself and Momentus about his ability to obtain an export control license and asylum application may have been misrepresentative of a material fact or misleading by omission of a material fact to reasonable investors.  Under these circumstances, the Complaint plausibly alleges that Defendant directly misrepresented a material fact or possessed and breached a duty to disclose a material fact in order to make his statements not misleading.

B.    Scienter

To prove scienter, the SEC must show that Defendant acted with "intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).  "Extreme recklessness can satisfy this scienter requirement."  *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 639 (D.C. Cir. 2008) (cleaned up).  Extreme recklessness goes beyond "a should have known standard" and involves conduct that "presents a danger of misleading buyers or sellers

---

[21]    Reasonable investors can perhaps be expected to appreciate that litigation outcomes are subject to inherent uncertainty.  The Court will allow the SEC to take discovery on the asylum allegation because of the sufficiency of the SEC's allegations that Defendant did not tell the complete story on his asylum application.  *See In re CBL & Assocs. Properties, Inc. Sec. Litig.*, 2022 WL 1405415, at *6−7 (E.D. Tenn. May 3, 2022), *opinion clarified on other grounds*, 2022 WL 1714484 (E.D. Tenn. May 25, 2022) (holding that plaintiffs pleaded materiality of company's statements about litigation because despite the uncertainties of litigation they "allege[d] facts demonstrating that [the company] chose to speak about the . . . litigation but did not do so truthfully").

that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (cleaned up).  For purposes of pleading, the SEC may show scienter by alleging "facts to show that defendants had both motive and opportunity to commit fraud or . . . facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Stevens v. InPhonic*, 662 F. Supp. 2d 105, 115 (D.D.C. 2009) (cleaned up).

The SEC has pled such facts.  The alleged motive is predictable.  Defendant stood to benefit financially from a successful mission and merger with Stable Road, which would increase investor confidence in the technology behind Momentus's business model.  *See* Dkt. 1 ¶¶ 21–22, 47.  The opportunity was plentiful.  Defendant made statements about the mission's results to Stable Road's CEO, PIPE investors, institutional investors, analysts, industry press, and the public.  *See, e.g.*, *id.* ¶¶ 85, 89.  Moreover, Defendant's omission of the mission's unencouraging results when discussing its apparent success, *id.* ¶¶ 26–30, indicate that Defendant acted consciously or recklessly to mislead investors with respect to the results of the El Camino Real mission.

The same holds true for the statements concerning the export control license and Defendant's asylum application.  Obtaining an export control license would let Defendant access certain Momentus technologies that were otherwise restricted for national security purposes, and Defendant obtaining asylum would have allowed him to remain and work in the United States. *Id.* ¶¶ 5, 35.  The motive, again, was financial.  Immigration-status and national security clearances would have aided the success of Momentus, which in turn would result in a lucrative financial gain for Defendant.  *Id.* ¶¶ 21–22, 47.   The opportunity was the same.  As the CEO of

Momentus, Defendant was able to speak to Stable Road's CEO about his asylum application during merger negotiations and he helped draft, reviewed, and approved Momentus's contributions to the initial and amended S-4 registration statements.  *Id.* ¶¶ 54, 66.  Allegations of further circumstantial evidence of conscious misbehavior or recklessness include Defendant's discussion of the potential success of his asylum application and the necessary clearances, while omitting the substantial problems he knew about each issue.

C.     <u>In Connection with the Purchase or Sale of Securities</u>

The SEC must also support the allegation that the misrepresentations and omissions were made "in connection with" the purchase or sale of securities.  "The Supreme Court has held that the 'in connection with' element is a broad and flexible standard and that any activity 'touching the sale of securities' will suffice."  *SEC v. Levine*, 671 F. Supp. 2d 14, 31 (D.D.C. 2009) (quoting *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12–13 (1971)) (cleaned up).  "It has been held that this requirement is satisfied whenever it may reasonably be expected that a publicly disseminated document will cause reasonable investors to buy or sell securities in reliance thereon . . . ."  *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1171 (D.C. Cir. 1978); *see also e-Smart Techs., Inc.*, 31 F. Supp. 3d at 82.

Defendant's alleged misrepresentations were made in public SEC and FCC filings, Dkt. 1 ¶¶ 53–54; slides and statements from presentations to PIPE investors, institutional investors, and analysts, *id.* ¶¶ 51–52; communications to industry media, *id.* ¶ 31; and communications to Stable Road's CEO that were allegedly incorporated into Stable Road's negotiations with Momentus and communications to investors, *id.* ¶ 50.  These are all sources of information on

which investors may reasonably be expected to rely, particularly the claims that made their way into public filings and into investor and analyst presentations.  Therefore, the Complaint alleges sufficient facts to establish this element.

In sum, the Complaint alleges sufficient factual matter against Defendant to establish all elements of securities fraud under Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act.  Therefore, the Complaint alleges sufficient factual matter to state a claim to relief that is plausible on its face, with respect to Counts I and II.

## II.     Aiding and Abetting Securities Fraud (Counts III and IV)

The SEC also alleges that Defendant participated in creating, editing, and approving investor presentations and publicly filed registration statements in which Momentus knowingly or recklessly made material misrepresentations, in violation of Section 20(e) of the Exchange Act, codified at 15 U.S.C. § 78t(e), and Section 15(b) of the Securities Act, codified at 15 U.S.C. § 77o(b).  *See* Dkt. 1 ¶¶ 95, 99.  These two provisions are "substantially identical."  *Milan Grp.*, 962 F. Supp. 2d at 192.  Both state that "'any person that knowingly or recklessly provides substantial assistance to another person . . . shall be deemed to be in violation . . . to the same extent as the person to whom such assistance is provided.'"  *Id.* (quoting 15 U.S.C. § 78t(e) and 15 U.S.C. § 77o(b)).

"[T]hree principal elements are required to establish liability for aiding and abetting a violation of [S]ection 10(b) and Rule 10b-5: (1) that a principal committed a primary violation; (2) that the aider and abettor provided substantial assistance to the primary violator; and (3) that the aider and abettor had the necessary 'scienter'—*i.e.*, that [he] rendered such assistance

knowingly or recklessly." *Graham v. SEC*, 222 F.3d 994, 1000 (D.C. Cir. 2000) (surveying law of other circuits); *see also SEC v. May*, 648 F. Supp. 2d 70, 78 (D.D.C. 2009).  "A secondary violator may act recklessly, and thus aid and abet an offense, even if he is unaware that he is assisting illegal conduct." *Howard v. SEC*, 376 F.3d 1136, 1143 (D.C. Cir. 2004).  Scienter "may be found if the alleged aider and abettor encountered 'red flags,' or 'suspicious events creating reasons for doubt' that should have alerted him to the improper conduct of the primary violator." *Id.* (quoting *Graham*, 222 F.3d at 1006); *see also Milan Grp., Inc.*, 962 F. Supp. 2d at 192.  Because of the close similarity between Section 10(b) and Section 17(a) and their respective aiding and abetting provisions noted above, *see Milan Grp., Inc.*, 962 F. Supp. 2d at 191–92, the Court conducts the same analysis of the three elements.

The Court holds that the Complaint alleges facts that plausibly satisfy all three elements. First, Momentus plausibly committed a primary violation because it drafted portions of Stable Road's registration statements that were misleading to investors.  These include: (1) Momentus has "successfully tested [its] water plasma propulsion technology in space," *see* Dkt. 1 ¶ 55; (2) Defendant had not "yet" obtained an export control license, *id.* ¶ 80; and (3) Momentus believed Defendant's asylum application would be granted, *id.* ¶ 79.  As discussed above, these claims are plausibly misrepresentative of a material fact or misleading by omission of a material fact under Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, and Section 17(a) of the Securities Act.  Momentus was the "maker" of these misrepresentations in the registration statements because "attribution within a statement or implicit from surrounding circumstances is strong

evidence that a statement was made by—and only by—the party to whom it is attributed." *Janus Cap. Grp., Inc. v. First Derivative Traders,* 564 U.S. 135, 142–43 (2011).

Second, Defendant provided substantial assistance to Momentus.  He helped draft, edit and review, and ultimately approved these statements prepared by Momentus for Stable Road's registration statements.  *See* Dkt. 1 ¶ 54–55.  That conduct constitutes substantial assistance.  *See SEC v. Brown*, 740 F. Supp. 2d 148, 168 (D.D.C. 2010) (allegations that CFO prepared, reviewed, and approved proxy statements were adequate to allege substantial assistance of company's primary violation based on misstatements therein).

Third, as discussed above, Defendant possessed the necessary scienter because he had both motive and opportunity to assist in Momentus's alleged fraud, and there is strong circumstantial evidence of his conscious misbehavior or recklessness.

As a result, the Complaint alleges sufficient factual matter to state a claim to relief that is plausible on its face, with respect to Counts III and IV.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that Defendant's Motion to Dismiss the Complaint, Dkt. 8, is **DENIED**.


_____
ANA C. REYES
United States District Judge

Date:   March 23, 2023